The **REPUBLIC OF THE PHILIPPINES, Plaintiff–Appellee,**

v.

**Ferdinand E. MARCOS, et al., Defendants–Appellants.**

**No. 86–6091.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1988.

Decided Dec. 1, 1988.

Special Concurrence, Dec. 2, 1988.

Richard A. Hibey, Anderson, Hibey, Nauheim & Blair, Washington, D.C., John J. Bartko, Bartko, Welsch, Tarrant & Miller, and Stephen Horn, Schmeltzer, Aptaker & Sheppard, P.C., Washington, D.C., for defendants-appellants Ferdinand E. Marcos, Imelda R. Marcos and Ramon Azurin.

John J. Stumreiter, Rosenfeld, Meyer & Susman, Beverly Hills, Cal. and Gerald Walpin, Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendants-appellants Diosdado C. Ordonez and Ancor Holdings, N.V.

Ronald L. Olson, Bradley S. Phillips, Richard B. Kendall, Munger, Tolles & Olson, Los Angeles, Cal., for plaintiff-appellee Republic of the Philippines.

Richard K. Willard, Asst. Atty. Gen., James M. Spears, Deputy Asst. Atty. Gen., Robert C. Bonner, U.S. Atty., Robert E. Kopp, John F. Cordes, and John P. Schnitker, Asst. U.S. Attys., Washington, D.C., for the amicus curiae U.S.

Before BROWNING, Chief Judge, ANDERSON,[*] SCHROEDER, FLETCHER, PREGERSON, ALARCON, CANBY, NORRIS, BEEZER BRUNETTI, and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

The Republic of the Philippines (the Republic) brought a civil suit against its former president, Ferdinand Marcos, and his wife Imelda (the Marcoses), asserting claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.

---

[*] Judge Anderson heard argument and participated in the discussion of this case, but died before the opinion was finally agreed upon.

C. §§ 1961 *et seq.*, and other applicable law. The district court on June 25, 1986 entered a preliminary injunction enjoining the Marcoses from disposing of any of their assets save for the payment of attorney fees and normal living expenses. The Marcoses appealed. A panel of this court reversed, 2–1. 818 F.2d 1473 (9th Cir.1987). We took the case en banc and now affirm the district court.

### Federal Jurisdiction

The Republic alleges that the Marcoses engaged in mail fraud, wire fraud, and the transportation of stolen property in the foreign or interstate commerce of the United States. The acts alleged are crimes under 18 U.S.C. §§ 1341, 1343, and 2315. The Republic alleges that the acts were repeated, forming a pattern of predicate acts under RICO, 18 U.S.C. § 1961, and thereby giving rise to civil liability under RICO, 18 U.S.C. § 1964.

■ Contrary to the contention of the Marcoses, the Republic as a governmental body is a person within the meaning of 18 U.S.C. § 1961(3). *Illinois Department of Revenue v. Phillips*, 771 F.2d 312 (7th Cir. 1985). The foreign nature of the Republic does not deprive it of statutory personhood. *Cf. Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978). Accordingly the Republic has standing to assert the RICO claims.

■ Contrary to the contention of the Marcoses, the complaint, as interpreted by the district court, sufficiently alleges a RICO offense. The Republic alleges that the Marcoses and the other defendants arranged for the investment in real estate in Beverly Hills, California of $4 million fraudulently obtained by the Marcoses; that the Marcoses arranged for the creation of two bank accounts in the name of Imelda Marcos at Lloyds Bank of California totaling over $800,000 also fraudulently obtained by the Marcoses; and that the Marcoses transported *into* Hawaii money, jewels, and other property worth over $7 million also fraudulently obtained by them. Criminal conduct under RICO "forms a pattern if it embraces criminal acts that have

the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285, n. 14, 87 L.Ed.2d 346 (quoting 18 U.S.C. § 3575(e)). The purposes of the acts here alleged are the same—to invest and to conceal fraudulently-obtained booty. The results are the same—the investment of the booty. The principals are the same—the Marcoses. The victim is the same—the Republic. The episodes are not isolated events. They represent a plan and a practice of getting the fruits of fraud out of the Philippines and into the assumed safety of the United States. If proved, the allegations show acts that form a pattern.

■ Contrary to the contention of the Marcoses, the complaint as read by the district court also alleges a RICO enterprise. A RICO enterprise has been found to consist of "a group of individuals associated in fact for the purpose of illegally trafficking in narcotics ..., utilizing the United States mail to defraud ..., and corruptly influencing ... the outcome of state court proceedings." *United States v. Turkette*, 452 U.S. 576, 579, 101 S.Ct. 2524, 2526, 69 L.Ed.2d 246 (1981). Here there is alleged to be a group of individuals associated in fact for the purpose of illegally investing the fruits of fraud and illegally using the mails and wire and illegally transporting in interstate commerce the fruits of the fraud.

■ The effect on the commerce of the United States of engaging in mail or wire fraud or bringing stolen property into the country is palpable. The Marcoses are mistaken in arguing that such criminal acts have no consequences for commerce to or in this country. The criminal enterprise which they are charged with conducting consisted in operations taking place within the United States. These operations had multiple effects on the domestic and foreign commerce of this country. If the operations were criminal, the operators incurred criminal liability under our law.

*United States v. Stratton,* 649 F.2d 1066, 1075 (5th Cir.1981) (appearance of out-of-state litigants before court that was a criminal RICO enterprise); *United States v. Altomare,* 625 F.2d 5 (4th Cir.1980) (interstate telephone calls perpetuating RICO enterprise affected interstate commerce). The Republic's allegations are sufficient to establish federal jurisdiction. 18 U.S.C. § 1964.

### Pendent Jurisdiction

The gravamen of the Republic's entire case is the allegation that the Marcoses stole public money:

> During his twenty years as President of the Philippines, *Mr. Marcos used his position of power and authority to convert and cause to be converted, to his use* and that of his friends, family, and associates, *money, funds, and property belonging to the Philippines and its people.* Complaint, ¶ 12 (emphasis added).

This common allegation supports not only plaintiff's RICO claims but also the eight claims for conversion, fraud and deceit, constructive fraud, constructive trust, breach of implied contract, quiet title, accounting, and subrogation. The claims for a constructive trust, to quiet title, an accounting, and subrogation merely set forth different forms of relief for the same underlying wrongs.

■ The Republic's strategy of bringing suit in a number of other jurisdictions is not decisive of the question whether the claims are such that they would ordinarily be tried in one judicial proceeding. The present location of the sought-for funds in banks in various countries is not determinative as to the underlying wrongs alleged in the complaint. The claims brought in this suit would ordinarily be tried in a single case. In both the RICO and non-RICO claims, the Republic alleges that the Marcoses converted public funds while in office. The district court concluded:

> This Court has pendent jurisdiction over plaintiff's other claims under state and foreign law in that such claims arise from a common nucleus of operative fact

and are so intertwined with other matters pending before the court as to make the exercise of such jurisdiction over these claims appropriate.

The district court was correct in asserting pendent jurisdiction over these claims. They derive from "a common nucleus of operative fact" and are such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The power of a federal court to decide pendent claims is "wide-ranging." *See Carnegie–Mellon Univ. v. Cohill,* —— U.S. ——, 108 S.Ct. 614, 618, 98 L.Ed.2d 720 (1988). The exercise of the power is discretionary but ordinarily the power if it exists is exercised; only exceptionally is the power not employed. *See* C. Wright, A. Miller & E. Cooper 13B *Federal Practice and Procedure* § 3567.1 (1984 and 1988 Supp.).

■ The common nucleus of operative facts that binds the RICO and non-RICO claims together is pleaded in paragraph 12, which is incorporated by reference into each claim for relief. To prove the predicates for RICO that allegedly occurred in this country, the Republic will have to prove theft, the acceptance of bribes, extortion, conspiracy, and similar acts in the Marcoses' conduct of the government in the Philippines. For example, to prove that stolen money was unlawfully transported in the United States, the Republic will have to prove theft in the Philippines. The operative facts necessary as part of the proof of the RICO claim are also the facts necessary to prove the theft. The RICO claims cannot be proved without getting deeply into the pendent claims and proving some or all of them. Because the acts charged, if proved, support both the RICO and the non-RICO claims, the district court has subject matter jurisdiction over all claims in the Republic's complaint.

True, the pendent claims may involve more property than that which entered into or affected the foreign or domestic commerce of the United States. The dissent appears to assume that jurisdiction over the pendent claims cannot extend beyond

this property. But that is not the law. Properly pendent claims need not be for the identical property involved in the federal cause of action. The pendent claims remain within the court's jurisdiction if the vital facts that must be proved as predicates of the RICO claims are the same as those that must be proved to establish the extortion, bribery, theft, fraud, and conversions alleged by the pendent claims.

At "every stage of the proceeding" the district court must exercise discretion as to the pendent claims. *See Carnegie–Mellon Univ. v. Cohill*, 108 S.Ct. at 618. In light of a more fully developed record than that now before this court, the district judge may conclude that some or all of the pendent claims should be dismissed notwithstanding our holding that the district court has the power to assert jurisdiction over those claims. *Gibbs*, 383 U.S. at 727, 86 S.Ct. at 1139. *See also* 3A J. Moore, W. Taggert & J. Wicker, *Moore's Federal Practice* ¶ 18.07[1.–3] at 18–36–37 (2d ed. 1987). As of the record now before us, pendent jurisdiction exists and supports an injunction based on the pendent claims.

### Act of State and Political Question

Before determining whether issuance of an injunction was appropriate we consider two defenses which, if accepted, would block trial of the case: the Marcoses maintain, first, that their acts are insulated because they were acts of state not reviewable by our courts; and second, that any adjudication of these acts would involve the investigation of political questions beyond our courts' competence.

■ *Acts of State.* The classification of certain acts as "acts of state" with the consequence that their validity will be treated as beyond judicial review is a pragmatic device, not required by the nature of sovereign authority and inconsistently applied in international law. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 421–22, 84 S.Ct. 923, 936–37, 11 L.Ed.2d 804 (1964). The purpose of the device is to keep the judiciary from embroiling the courts and the country in the affairs of the foreign nation whose acts are challenged.

Minimally viewed, the classification keeps a court from making pronouncements on matters over which it has no power; maximally interpreted, the classification prevents the embarrassment of a court offending a foreign government that is "extant at the time of suit." *Id.* at 428, 84 S.Ct. at 940.

■ The "continuing vitality" of the doctrine depends on "its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign relations." *Id.* at 427–28, 84 S.Ct. at 939–40. Consequently, there are "constitutional underpinnings" to the classification. *Id.* at 423, 84 S.Ct. at 938. A court that passes on the validity of an "act of state" intrudes into the domain of the political branches. The proper application of the doctrine is illustrated by *Occidental Petroleum Corp. v. Buttes Gas & Oil Co.*, 331 F.Supp. 92 (C.D.Cal.1971), *aff'd per curiam*, 461 F.2d 1261 (9th Cir.), *cert. denied*, 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972).

■ As a practical tool for keeping the judicial branch out of the conduct of foreign affairs, the classification of "act of state" is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scrutiny in our courts. No estoppel exists insulating a deposed dictator from accounting. No guarantee has been granted that immunity may be acquired by an ex-chief magistrate invoking the magic words "act of state" to cover his or her past performance.

■ The classification might, it may be supposed, be used to prevent judicial challenge in our courts to many deeds of a dictator in power, at least when it is apparent that sustaining such challenge would bring our country into a hostile confrontation with the dictator. Once deposed, the dictator will find it difficult to deploy the defense successfully. The "balance of considerations" is shifted. *Sabbatino*, 376 U.S. at 428, 84 S.Ct. at 940. *A fortiori*, when a ruler's former domain has turned

against him and seeks the recovery of what it claims he has stolen, the classification has little or no applicability. The act of state doctrine is supple, flexible, ad hoc. The doctrine is meant to facilitate the foreign relations of the United States, not to furnish the equivalent of sovereign immunity to a deposed leader.

In the instant case the Marcoses offered no evidence whatsoever to support the classification of their acts as acts of state. The burden of proving acts of state rested upon them. *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695, 96 S.Ct. 1854, 1861, 48 L.Ed.2d 301 (1976). They did not even undertake the proof. The United States, invited by the court to address this matter as an amicus, assures us that the Executive does not at present see the applicability of this defense. *Brief of the United States of America as Amicus Curiae*, p. 11. The act of state doctrine, the Executive declares, has "no bearing" on this case as it stands. As the doctrine is a pragmatic one, we cannot exclude the possibility that, at some later point in the development of this litigation, the Marcoses might produce evidence that would warrant its application. On the present record, the defense does not apply.

*Political Questions.* Bribetaking, theft, embezzlement, extortion, fraud, and conspiracy to do these things are all acts susceptible of concrete proofs that need not involve political questions. The court, it is true, may have to determine questions of Philippine law in determining whether a given act was legal or illegal. But questions of foreign law are not beyond the capacity of our courts. *See Zschernig v. Miller*, 389 U.S. 429, 461, 88 S.Ct. 664, 681, 19 L.Ed.2d 683 (1968) (Harlan, J. concurring); Fed.R.Civ.P. 44.1 (allowing consideration of foreign law materials). The court will be examining the acts of the president of a country whose immediate political heritage is from our own. Although sometimes criticized as a ruler and at times invested with extraordinary powers, Ferdinand Marcos does not appear to have had the authority of an absolute autocrat. He was not the state, but the head of the state, bound by the laws that applied to him. Our courts have had no difficulty in distinguishing the legal acts of a deposed ruler from his acts for personal profit that lack a basis in law. As in the case of the deposed Venezuelan ruler, Marcos Perez Jimenez, the latter acts are as adjudicable and redressable as would be a dictator's act of rape. *Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir.1962).

### The Convenience of the Forum

The Marcoses maintain that the Republic's action should have been dismissed, even if the district court had jurisdiction, on the ground of *forum non conveniens*. They point to the foreign character of the plaintiff, the nature of the Republic's claims about the Marcoses' conduct in office, and the fact that the court will be called upon to decide questions of Philippine law. The inconvenience of the forum was argued by the Marcoses to the district court. But the court did not address the argument. On the present record the district court did not abuse its discretion in refusing to dismiss the Republic's action on *forum non conveniens* grounds before issuing the preliminary injunction.

### Injunction Rather Than Attachment

Fed.R.Civ.P. 64 makes available all remedies for the seizure of property "in the manner provided by the law of the state in which the district court is held." The Marcoses argue that the freeze of their assets is an attachment and that California law permits attachment only in connection with a claim based upon a contract. Cal.Civ. Proc.Code § 483.010(c). The Marcoses are mistaken. While a freeze of assets has the effect of an attachment, it is not an attachment. *F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir.1982). The court has power to preserve the status quo by equitable means. A preliminary injunction is such a means. *F.T.C.*, 668 F.2d at 1112.

### The Standard for Issuance of the Injunction

The issuance of the preliminary injunction was not an abuse of discretion by the

district court if that court properly concluded that the Republic had shown the probability of success on the merits of its pendent claims and the possibility of irreparable injury, or that the pendent claims raised serious questions and the balance of hardships tipped sharply in favor of the Republic. *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir.1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir.1987) (quoting *San Diego Committee Against Registration and the Draft v. Governing Board of the Grossmont Union High School Dist.*, 790 F.2d 1471, 1473 n. 3 (9th Cir.1986)). "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge of Int'l Assoc. of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979) (citation omitted).

For the purposes of injunctive relief, "serious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo. Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir.1952) (Frank, J.). Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits." *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985) (Duniway, J.). Applying these principles and definitions to this case, we conclude that the district court did not abuse its discretion in granting the preliminary injunction.

The district court stated orally that "the hardship is clearly on the side of the plaintiff." The district court also made the written finding that there was more than a mere possibility of irreparable harm; in fact, it concluded that the Republic *"would be irreparably injured if [the injunction] were not issued."* (emphasis added). The Marcoses have offered no evidence of any hardship they would suffer if the injunction were issued. Indeed, the district court stipulated in the injunction that the Marcoses may use their assets to cover normal living expenses and legal fees. Irreparable injury was weighed against zero evidence of hardship. On this record, the balance of hardships tipped decidedly in the Republic's favor.

The district court also concluded that the Republic had a "substantial likelihood" of prevailing on the merits. Although we do not read this as a finding of *probability* of success, we do believe that it represents a finding that the Republic has at least a fair chance of success, which is all that is required. *See Benda*, 584 F.2d at 315. We agree with the district court that the Republic has at least a fair chance of prevailing on the merits, including on the merits of its constructive trust claim.

The Republic presented evidence that in February 1986 the Marcoses had transported from the Philippines to Hawaii $8.2 million worth of cash, negotiable instruments, jewelry, and other property, allegedly derived from the Marcoses' wrongdoing in the Philippines. Ferdinand Marcos swore by affidavit that it had not been his intention to go to Hawaii and that he had been taken there involuntarily by the government of the United States. But as he sought to recover from United States Customs all of these items he clearly intended to introduce them into the United States. He used the United States mail and telephone services for this purpose.

The Republic also presented evidence that since at least 1968 the Marcoses had a checking account at a bank in Beverly

Hills, California and that this account was used to make payments of $200,000 to "William Saunders" and $100,000 to "Jane Ryan." The Republic introduced evidence that these names were aliases under which Ferdinand Marcos and Imelda Marcos acted. The Republic presented evidence of the creation by the Marcoses in 1970 of a Lichtenstein entity entitled the "Sandy Foundation," which in effect was a trust to make investments for the benefit of the Marcoses and their children, Imelda, Ferdinand, and Irene, and which was funded by the Marcoses with an initial capital of 100,000 Swiss francs. The Republic presented evidence that "Jane Ryan" and "William Saunders" transferred their accounts to this trust and that Credit Suisse, a Zurich bank, was "the administering bank" of the trust. The Republic presented evidence of correspondence by the Marcoses as customers of that bank and the use by Imelda Marcos of the alias of Jane Ryan in dealing with that bank.

According to the Republic's evidence, a code was worked out for contacts between the Marcoses and the trust. According to a copy of a memorandum signed by Ferdinand Marcos, if he cabled "Happy Birthday" to the bank, its Hong Kong representative, Ralph Klein, would proceed to Manila and "contact him through Col. Fabian C. Ver." (Colonel Ver is now General Ver, associated with the Marcoses in power and in their flight from the Philippines.)

In addition to this evidence of secretive dealings in substantial sums of money in the course of which the Marcoses used a bank in California, the Republic submitted a statement by the Minister of the Budget of the Philippines as to the total salaries authorized to be paid Ferdinand Marcos as president from 1966 to 1985 and Imelda Marcos as a minister of government from 1976 to 1985. The total authorized amount is P 2,288,750, in dollars less than $800,000. The Republic submitted what purports to be a balance sheet signed by Ferdinand Marcos as part of a tax return stating his assets as of December 31, 1966 as P 150,000, in dollars less than $60,000. The Republic submitted the sworn deposition, executed June 16, 1986, of Rafael Fernando, Representative and Coordinator on the West Coast of the United States of the Presidential Commission on Good Government of the Republic of the Philippines. Fernando declares that Swiss bank authorities have documented to the government of the Republic the existence of bank accounts owned by Ferdinand Marcos in the amount of $200 million and have reported to the Republic the existence of other accounts held for or on behalf of him in the amount of approximately $1.3 billion.

The Marcoses' clandestine dealings with Credit Suisse and the Lichtenstein trust and the discrepancy between the purported balance sheet of 1966 and the reported assets of 1986, coupled with the reported authorized salaries of the Marcoses as members of the government of the Republic, give rise to the inference that very large sums of money were amassed by the Marcoses by the unlawful means alleged by the Republic. The inference depends in part on the hearsay statements of Fernando. It was within the discretion of the district court to accept this hearsay for purposes of deciding whether to issue the preliminary injunction. *Flynt Distrib. Co., Inc. v. Harvey,* 734 F.2d 1389, 1394 (9th Cir.1984) ("The urgency of obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain affidavits from persons who would be competent to testify at trial. The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial."); *see also K–2 Ski Co. v. Head Ski Co.,* 467 F.2d 1087, 1088 (9th Cir.1972) (trial court may consider allegations in verified complaint in issuing preliminary injunction). No affidavits countering the inference were presented by the Marcoses. *See K–2 Ski Co.,* 467 F.2d at 1089. The Republic's case remains to be proved. The Republic has put forward enough to show a fair chance of succeeding with its proof.

### The Scope of the Injunction

■ The injunction is directed against individuals, not against property; it enjoins the Marcoses and their associates from

transferring certain assets wherever they are located. Because the injunction operates *in personam*, not *in rem*, there is no reason to be concerned about its territorial reach. *See, e.g., Steele v. Bulova Watch Co.*, 344 U.S. 280, 289, 73 S.Ct. 252, 257, 97 L.Ed. 319 (1952) (district court "in exercising its equity powers may command persons properly before it to cease to perform acts outside its territorial jurisdiction") (citations omitted).

A court has the power to issue a preliminary injunction to prevent a defendant from dissipating assets in order to preserve the possibility of equitable remedies. *See, e.g., F.T.C. v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir.1982) (preliminary injunction appropriate to preserve the possibility of equitable remedies). The injunction here enjoins the defendants from secreting those assets necessary to preserve the possibility of equitable relief.

Although the gravamen of the complaint is that the Marcoses converted public property to their own use, the seventh claim for relief, which alleges a constructive trust, states an equitable cause of action and seeks equitable relief: "[The Marcoses], by virtue of their position as President of the Philippines and Governor of Manila, respectively, occupied positions of trust as to the Philippines and its people. [The Marcoses] violated said trust by their numerous acts of conversion, fraud, deceit, constructive fraud, civil conspiracy, acts of racketeering, and other unlawful acts." As the result of these asserted violations of trust, the Marcoses acquired specific funds and real property, including the accounts with Lloyds Bank, the real property in Beverly Hills, the deposits with the Swiss banks and the property brought into Hawaii. Complaint, ¶¶ 62–67. In granting the preliminary injunction, the district court specifically found "that the Philippines will be entitled to an accounting for, and to impose a constructive trust upon, the property subject to this Order." The district court found the preliminary injunction necessary to preserve the possibility of equitable relief. On this record, the district court did not abuse its discretion in entering an injunction of this scope.

The district court remains free to modify or dissolve the preliminary injunction if warranted by developments in this case subsequent to the noticing of this appeal. *Lyng v. Northwest Indian Cemetery Protective Assoc.*, —— U.S. ——, 108 S.Ct. 1319, 1330, 99 L.Ed.2d 534 (1988). *See also* 7 J. Moore, W. Taggert & J. Wicker, *Moore's Federal Practice* ¶ 65.07 at 65–114 (2d ed. 1987).

*In Summation.* Jurisdiction to hear the Republic's claims and to enter the preliminary injunction exists. A serious question of liability has been presented and the Republic has a fair chance of success on the merits of its case. The Marcoses have not presented any preclusive defense. The scope of the injunction is justified. It was imperative for the district court to preserve the status quo lest the defendants prevent resolution of the case by putting their property beyond the reach of the court. Hardship to the Republic would have been great and irreparable if the district court had not taken its prudent, amply justified action to keep the Marcoses' assets from disappearing.

AFFIRMED.

SCHROEDER, Circuit Judge, with whom CANBY, Circuit Judge, joins concurring in part and dissenting in part.

I join in the majority's conclusion that there is a well-pleaded RICO claim providing federal subject matter jurisdiction. I agree further that the act of state doctrine is not a threshold bar to considering the activities of the defendants during the time that Mr. Marcos was the Philippine head of state. Those were the principal issues that a majority of the three-judge panel considered and that we undertook to decide in this en banc proceeding.

The injunction we review, however, was entered only a week after this suit was filed, and the record before us is minimal. It does not provide support for the majority's resolution of the further issues it must reach, without reasoned analysis, in order

to uphold this injunction. I therefore dissent from the affirmance.

The injunction is based upon the district court's exercise of pendent jurisdiction, not federal question jurisdiction. It is based on a complaint alleging, in the most sweeping of generalities, pendent claims of fraud and conversion by the Marcoses over the course of twenty years. The pendent claims are alleged to be violations of as yet unspecified laws of as yet unspecified states and countries. The district court's injunction purports to reach over a billion dollars worth of assets, the bulk of which are located in Switzerland. *See Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1476 (9th Cir.1987).

To affirm this injunction, the majority must hold that the district court properly exercised pendent jurisdictional authority to reach all of the Marcoses' property, wherever located. I cannot agree. The basis for federal jurisdiction is contained in RICO allegations of illegal activities concerning assets now located in the United States. There has been no showing that these claims arise in any way from the same allegedly wrongful transactions through which the Marcoses acquired other property located elsewhere. Nor does the record disclose any reason why a court in California, as opposed to courts in the Philippines or Switzerland, should decide claims to property stolen from the Philippines and transported to Switzerland. I therefore part company with the majority when it affirms on this record the district court's issuance of a preliminary injunction preventing the Marcoses from disposing of any assets anywhere in the world.

In my view the existence of pendent jurisdiction over claims reaching all the Marcoses' assets has not yet been established. As explained more fully below this injunction should be vacated and the matter remanded to the district court for consideration of pendent jurisdiction and other issues on the basis of a fuller record.

## BACKGROUND

The plaintiff sought an injunction to be entered solely in the exercise of pendent jurisdiction because RICO does not authorize injunctive relief. *See Religious Technology Center v. Wollersheim*, 796 F.2d 1076, 1088–89 (9th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987). RICO, however, does provide the requisite federal question jurisdiction.

For the RICO predicate acts in violation of the laws of the United States, the complaint alleged violations of 18 U.S.C. §§ 1341, 1343, 2314, and 2315. The alleged racketeering activities essentially involve mail and wire fraud and the importation of stolen goods into the United States. The showing before the district court of the Marcoses' actual holdings in the United States included the Marcoses' interests in California real estate, the existence of a bank account with a California bank, and the transporting to Hawaii of $8.2 million in funds and property.

The district court granted the injunction in conclusory fashion, finding:

(1) That there is a substantial danger that, if this Order were not issued, the parties against whom this Order is directed would transfer or conceal funds, property, books and records, placing said items beyond the Court's process and recovery by the Philippines in this action.

(2) That the Philippines therefore would be irreparably injured if this Order were not issued.

(3) That there is a substantial likelihood that the Philippines will prevail in this action, and that the Philippines will be entitled to an accounting for, and to impose a constructive trust upon, the property subject to this Order.

When this court first considered this appeal, a fractured three-judge panel held that the complaint should have been dismissed in its entirety. A majority of the panel held that the act of state doctrine prevented the court from inquiring into the Marcoses' activities during the period in question. *Marcos*, 818 F.2d at 1489–90. Because a majority of the panel concluded that the act of state doctrine prevented the court from adjudicating any of the claims, the majority did not need to consider, and

did not address, the issues of pendent jurisdiction.

Judge Hall, in a separate concurring opinion, concluded that there was additionally a lack of subject matter jurisdiction because no RICO claim had been well pleaded. *Id.* at 1490–91.

Judge Nelson dissented, disagreeing with the other judges as to the applicability of the act of state doctrine. The dissent argued persuasively that the majority's holding with respect to the act of state doctrine was inconsistent with existing Supreme Court and Ninth Circuit authority. *Id.* at 1492–95. We granted en banc review because of that inconsistency, which was the principal focus of the petition for rehearing and rehearing en banc filed by the Government of the Philippines.

## RICO CLAIMS AND FEDERAL QUESTION JURISDICTION

In defense of the panel's decision that the complaint be dismissed in its entirety, the Marcoses have focused upon Judge Hall's separate opinion that there was no well-pleaded RICO claim and hence no federal jurisdiction. *See id.* at 1490–91. The Marcoses have urged that in order to make out a claim under RICO, the complaint would have to allege that there was an adverse economic impact upon the United States by virtue of the defendants' conduct.

RICO, however, was aimed at the destructive effect of organized criminal activity on our society. Its provisions do not focus on any adverse effect of specific activity on the nation's GNP. Its history emphasizes the adverse consequences of organized crime on our democratic processes, our domestic security and our general welfare, including but not limited to the economic system. *See* RICO Statement of Findings and Purpose, Pub.L. No. 91–452, 84 Stat. 922 (1970), 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Admin.News 1073. The Supreme Court has stated:

> RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, ... but also of its express admonition that RICO is to "be liberally construed to effectuate its remedial purposes." ... RICO was an aggressive initiative to supplement old remedies and develop new methods for fighting crime.

*Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985); *see also Russello v. United States,* 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983) ("[t]he legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots").

What RICO does require is "a pattern of racketeering activity." 18 U.S.C. § 1962. By definition, "racketeering activity" necessitates a violation of one of our state or federal laws. 18 U.S.C. § 1961. Federal RICO jurisdiction thus attaches only to those activities that allegedly violate our domestic laws.

In this case, in Count One of the Complaint, the plaintiff alleges that the Marcoses engaged in mail and wire fraud, and importation of stolen property into the United States in violation of 18 U.S.C. §§ 1341, 1343, 2314, 2315. In engaging in these activities, the plaintiff alleges that the Marcoses were conducting a RICO enterprise as part of an association in fact with the other defendants. These allegations, on their face at least, would survive a motion to dismiss for lack of subject matter jurisdiction. I therefore agree that there is a RICO basis for federal subject matter jurisdiction.

Finding a basis for federal question jurisdiction is but a first step, however, in reviewing the propriety of this injunction. The claims on which this injunction rests are pleaded as claims pendent to the RICO claims. The next step is thus to consider whether the relationship between the pendent claims and the federal claims are sufficiently close to permit the district court to assume jurisdiction over pendent claims reaching the Marcoses' worldwide holdings. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed. 2d 218 (1966).

## THE INJUNCTION AND PENDENT JURISDICTION

In holding that the district court had pendent jurisdiction over claims to the Marcoses' assets wherever located in the world, the majority fails to appreciate that pendent jurisdiction can derive only when there is a sufficient factual connection between the activities giving rise to the pendent claims and the activities giving rise to the federal claims. In this case, such pendent jurisdiction should properly derive only from activities directly related to the alleged RICO violations of United States law. These comprise the alleged fraudulent dealings in this country and illegal importation of assets into the United States. It is not enough for the majority to characterize all the claims as involving criminal misconduct. *See* majority op. at 1359–1360.

Plaintiff claims the assets now in the United States are traceable to thefts of assets rightfully belonging to the people of the Philippines. There may well be a sufficient factual nexus to sustain pendent jurisdiction for claims arising from the original wrongful appropriations of the property now found in this country. This is because the property is the same. No such factual link as yet exists for the pendent claims to property transferred from the Philippines to other countries.

It is an elementary legal principle that federal courts are courts of limited jurisdiction. There are constitutional restraints on their exercise of jurisdiction. The Constitution restricts federal courts' jurisdiction to claims "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority." U.S. Const., art. III, § 2. When a plaintiff pleads a federal claim within a district court's federal subject matter jurisdiction, a plaintiff may not automatically bring any other claim against the same defendant. Subject matter jurisdiction of non-federal claims, under the judicially-created doctrine of pendent jurisdiction, depends upon the relationship between those claims and the federal claims.

The Supreme Court initially set out the concept underlying pendent jurisdiction in 1824 in *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 6 L.Ed. 204 (1824). There, the Court stated that

when a question to which the judicial power of the Union is extended by the constitution, forms an ingredient of the original cause, it is in the power of congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or of law may be involved in it.

*Id.* at 823. The Court subsequently expanded the *Osborn* doctrine in *Siler v. Louisville & Nashville R.R. Co.,* 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909), then narrowed pendent jurisdiction's scope in *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933). Finally, more than two decades ago, the Court clarified the scope of pendent jurisdiction in *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In *Gibbs,* a unanimous Court rejected *Hurn* as "unnecessarily grudging," *id.* at 725, 86 S.Ct. at 1138, and adopted a two-part test resting on considerations of power and discretion. In evaluating a federal court's power to hear a pendent claim, the Court stated that:

[p]endent jurisdiction, in the sense of judicial *power,* exists whenever there is a claim "arising under [the] Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority ...," U.S. Const., Art. III, § 2, and the relationship between that claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional "case." The federal claim must have substance sufficient to confer subject matter jurisdiction on the court.... The state and federal claims must derive from a common nucleus of operative fact. But if, considered without regard to their federal or state character, a plaintiff's claims are such that he would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is *power* in federal courts to hear the whole.

*Id.*

Thus, federal claims and pendent claims must all derive from a "common nucleus of operative fact." They must also be the sort that would ordinarily be tried in "one judicial proceeding." *Id.* The majority opinion does not analyze the pendent claims. Instead, it merely announces that the pendent claims arose from a nucleus of operative fact common to the RICO claims. Majority op. at 1359.

In reviewing the entry of the preliminary injunction, we should consider the nature of the asserted pendent jurisdiction and address the two jurisdictional issues that *Gibbs* requires courts to address when dealing with pendent claims.

The first question, therefore, is whether the RICO claims and all of the pendent claims arise from a "common nucleus of operative fact." They do not. The RICO claims of necessity have to do with the defendants' activities that violated the criminal laws of the United States. The pendent claims are not limited to those activities and reach property that has not been shown to have any connection with the United States itself or violations of our law.

Upholding pendent jurisdiction in such circumstances is thus contrary to the teaching of decisions following *Gibbs* that have focused on the nexus between events underlying the federal cause of action and those underlying pendent state causes of action. *See, e.g., Finn v. Gunter*, 722 F.2d 711, 713 (11th Cir.1984) (finding pendent jurisdiction); *PAAC v. Rizzo*, 502 F.2d 306, 312–13 (3d Cir.1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975) (no pendent jurisdiction); *see also* C. Wright, A. Miller & E. Cooper, 13B *Federal Practice and Procedure* § 3567.1 (1984). Our circuit also evaluates pendent claims under the nexus test. *See, e.g., Klaus v. Hi–Shear Corp.*, 528 F.2d 225, 231 (9th Cir.1975). The plaintiffs have provided us with no explanation of how the pendent claims are related to the RICO claims. The only factual connection between all the claims of wrongdoing in this case appears to be a common plaintiff and common defendants. Under *Gibbs* and the constitu-

tional restraints on the exercise of power by the federal judiciary in Article III, that is not sufficient.

Moreover, even assuming there is a common nexus of fact reaching all the Marcoses' assets, pendent jurisdiction would exist only as to the claims that would ordinarily be tried in one judicial proceeding. *Gibbs*, 383 U.S. at 725, 86 S.Ct. at 1138. These are not such claims. The RICO claims allege violations of the United States' criminal laws through activities in this country. The pendent claims, on the other hand, encompass allegations of fraud and conversion stemming from the Marcoses' actions in the Philippines spanning a twenty-year period. Further, the bulk of the property claimed, according to the complaint, is located in Switzerland. The claims against the Marcoses are in fact already the subject of multiple judicial proceedings. *See, e.g., Republic of the Philippines v. Marcos*, litigation in the Southern District of New York, 86 Civ. 2294 (PNL), and *Republic of the Philippines v. Marcos*, litigation in the District of Hawaii, No. CV–86–0155 HMF. The plaintiff cites no case remotely similar in scope to this case. The claims here are not those ordinarily tried in one judicial proceeding.

## ACT OF STATE DOCTRINE

The majority of our three-judge panel concluded that the act of state doctrine bars consideration of the plaintiffs' claims. I agree with the majority of this en banc court that such a holding is not appropriate on this record. I do not agree with the majority, however, that this injunction can be affirmed without any regard to the act of state doctrine.

The panel majority's use of the act of state doctrine as a threshold bar in the circumstances of this case is not consistent with the development of that doctrine under Supreme Court authority. *See, e.g., Alfred Dunhill of London, Inc. v. Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). We have expressly stated that the act of state doctrine is not jurisdictional. *See International Association of Ma-*

*chinists and Aerospace Workers v. OPEC*, 649 F.2d 1354, 1359 (9th Cir.1981), *cert. denied*, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); *Timberlane Lumber Co. v. Bank of America*, 549 F.2d 597, 602 (9th Cir.1976), *cert. denied*, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). Rather, the doctrine involves the judiciary's prudential decision to refrain from adjudicating the legality of a foreign sovereign's public acts that were committed within its own territory. *See OPEC*, 649 F.2d at 1359; *see also Sabbatino*, 376 U.S. at 401, 84 S.Ct. at 926. The Supreme Court, in addressing the act of state doctrine, has stated:

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Sabbatino*, 376 U.S. at 416, 84 S.Ct. at 934 (quoting *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897)).

The act of state doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Sabbatino*, 376 U.S. at 423, 84 S.Ct. at 938. The Court further elaborated that the doctrine involves separation of powers:

> [The doctrine's] continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs.... [S]ome aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches.... [W]e

decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit.

*Id.* at 427–28, 84 S.Ct. at 940.

However, these considerations are less compelling in the situation before us, where the foreign government has itself invoked our jurisdiction, and the challenged actions involve a government no longer in power. In *Sabbatino*, the Supreme Court observed that, "[t]he balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence ... for the political interest of this country may, as a result, be measurably altered." 376 U.S. at 428, 84 S.Ct. at 940. "Moreover, the act of state doctrine reflects respect for foreign states, so that when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker." *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir.1986).

Further, the Supreme Court has noted that for doctrine to apply the acts in question must have involved public acts of the sovereign. The Court stated that in each of its act of state decisions, the facts were sufficient to demonstrate that

> the conduct in question was the public act of those with authority to exercise sovereign powers and was entitled to respect in our courts. [H]ere, no statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter determined to confiscate the amounts due three foreign importers.

*Alfred Dunhill*, 425 U.S. at 694–95, 96 S.Ct. at 1861.

Accordingly, the courts have insisted that the act of state doctrine precludes review of *public* acts of the *sovereign*. *See, e.g., Marcos*, 806 F.2d at 358 ("[t]hat the acts must be *public* acts of the *sover-*

*eign* has been repeatedly affirmed") (emphasis in original); *Filartiga v. Pena–Irala,* 630 F.2d 876, 889 (2d Cir.1980) ("we doubt whether action by a state official in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nation's government, could properly be characterized as an act of state"); *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380 (5th Cir. 1980) ("[t]he act of state doctrine only precludes judicial inquiry into the legality, validity, and propriety of the acts and motivations of foreign sovereigns acting in their governmental roles within their own boundaries"); *Jimenez v. Aristeguieta,* 311 F.2d 547, 557 (5th Cir.1962) ("judicial authorities cannot review the acts done by a sovereign in his own territory to determine illegality"); *Sharon v. Time, Inc.,* 599 F.Supp. 538, 544 (S.D.N.Y.1984) ("[t]he doctrine is limited to laws, decrees, decisions, seizures, and other officially authorized 'public acts' "); *see also Restatement (Second) of Foreign Relations Law* § 41 (1965) (doctrine involves refraining "from examining the validity of an act of a foreign state by which that state has exercised its jurisdiction to give effect to its public interest").

As the dissenting opinion of Judge Nelson quite rightly pointed out, the act of state doctrine cannot bar the plaintiffs' action at this stage in the proceedings due to the distinction between the official acts and the private conduct of a former head of state. As Judge Nelson stated:

Marcos and his agents no doubt exercised broad power, especially after the imposition of martial law in 1972. But the appropriate inquiry is not to invoke the talismanic label "dictator." The district court should determine which of the challenged acts were official and which were not. Only by doing so can the court determine the extent to which the act of state doctrine may apply.

818 F.2d at 1494–95.

At this point, no determinations have been made regarding the capacity in which the Marcoses were acting when the alleged unlawful conduct occurred. Accordingly, the original panel majority erred in finding that, at this stage of the litigation, the act of state doctrine bars adjudication of the bulk of the Philippine government's pendent claims.

The majority decision here, however, goes much further. It declares that the injunction can be affirmed without regard to the act of state doctrine. In my view, we should instead instruct the district court to consider to what extent, if any, the doctrine applies in the circumstances of this case, and on the basis of the record which has developed more fully during the pendency of this interlocutory appeal. Until such consideration can be given, an injunction of this breadth is not appropriate.

This en banc court requested the amicus views of the Department of State on the act of state issues. Its brief concludes that the application of the act of state doctrine at this stage is speculative and the injunction premature. The majority's reliance upon the position of the United States as support for its holding is wholly misplaced. The government urges that an injunction should not have been entered on the basis of this record. The government amicus curiae brief states in appropriate context as follows:

[T]he record before the district court, which did not include any detailed specification of the factual basis for the bulk of the nonfederal claims, did not make it possible even to analyze the extent to which those claims are properly before the court. . . .

Even assuming jurisdiction, it is not clear at this stage that the district court should, as a prudential matter, undertake to adjudicate the bulk of the nonfederal claims. The court's capacity to do so fairly and expeditiously and without offending the sensibility of other nations cannot be resolved on this record. Adjudication in this district court may turn out to be barred by considerations of international comity and *forum non conveniens.*

The act of state doctrine seems to us to have little or no bearing on this case at

this stage of its development. The doctrine provides, in general, that the validity of specific acts of a foreign sovereign is not subject to challenge in our courts; the circumstances of a particular case may, however, make that general principle inapplicable. On the present record, it is not clear that any act of state—an act of a sovereign within its territorial jurisdiction on matters pertaining to its governmental sovereignty—is involved in this case. Nor is it clear that the case would require an adjudication of the validity of such an act, without which the case could not fairly proceed. Under these circumstances, the bearing, if any, of the act of state doctrine on this case should be determined only after further development of the case on the merits. Amicus brief at 11–12.

The United States' views are wholly in accord with those expressed in this dissent and are in conflict with the majority.

### CONCLUSION

This injunction is unprecedented in its breadth. To decide the merits of the pendent claims, the district court would have to unravel all of the Marcoses' financial transactions over a long period of time and over much of the globe. It would take a corps of historians years to accomplish the task. We are not yet told why a single district judge in California should undertake it.

I would vacate the injunction and remand the matter to the district court for further consideration of the appropriate scope of a preliminary injunction.

FLETCHER, Circuit Judge, concurring specially in Judge SCHROEDER's concurring and dissenting opinion:

I concur fully in the following portions of Judge Schroeder's opinion: its discussion of the basis for finding jurisdiction based on a well-pleaded RICO claim; its discussion of the basis for concluding that the act of state doctrine is not a prudential bar at this stage of the proceedings in this case.

I concur only in its conclusion that the injunction should be vacated and remanded for further consideration in that I do not agree with its restrictive view of pendent jurisdiction (by the same token, I cannot agree with the majority's expansive approach). Also, I would stay the vacation of the injunction for a reasonable period of time to allow the district court to reconsider the injunction and its scope in light of the current state of the record.