**Central Oregon LANDWATCH, an Oregon non-profit corporation, Plaintiff**

**v.**

**Kent CONNAUGHTON, in his official capacity as Regional Forester of the Deschutes National Forest, John Allen, in his official capacity as Forest Supervisor of the Deschutes National Forest, and the United States Forest Service, a federal agency, Defendants.**

Civ. No. 6:12–cv–01757–TC.

United States District Court, D. Oregon.

Oct. 11, 2012.

**1194**

Christopher G. Winter, Ralph O. Bloemers, Crag Law Center, Portland, OR, for Plaintiff.

Stephen J. Odell, United States Attorney's Office, Portland, OR, for Defendants.

## ORDER

AIKEN, Chief Judge.

This case was filed on Sept. 27, 2012, by an Oregon non-profit corporation, Central Oregon Landwatch, alleging numerous environmental violations pursuant to the defendant Forest Service's lack of compliance with the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 et seq.; the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321; and the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq. Plaintiff filed a motion for a Temporary Restraining Order which this court granted on Thursday, October 4, 2012, until the court heard plaintiff's motion for preliminary injunction, scheduled on October 10, 2012. All parties requested an immediate ruling from this court to allow them to pursue settlement options with Magistrate Judge Coffin.

This dispute surrounds Tumalo Creek ("Creek"), a tributary of the Deschutes River that runs through Bend, Oregon. The Creek is home to redband, brown and brook trout. It has also been identified as a candidate for the potential reintroduction of bull trout. Despite extensive restoration efforts, the Creek remains listed on the Clean Water Act 303(d) list for high temperatures.

On September 18, 2012, the Forest Service approved the issuance of a special use permit to the City of Bend ("City") to construct the Bridge Creek Water Supply Project (the "Project"). In the short term, the Project requires cutting large spruce and other trees and permanently altering and filling wetlands. Once built and operational, the Project will result in increased water diversion and diminished water quality in the Creek during the lower flow summer months. The Project will permanently impact sensitive riparian ecosystems, including resident redband, brook and brown trout species. Lower flows and increased water temperatures threaten to foreclose the possibility of reintroducing bull trout to the Creek. The Project's lifespan is at least 75 years and is expected to substantially increase the diversion of water from the Creek watershed through a 30–inch water supply pipe for use by the City of Bend.

*Preliminary Injunction*

A. Standards

■ The party seeking a preliminary injunction must demonstrate that he or

she is (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Counsel, Inc.,* 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

■ Courts may apply a "sliding scale" approach in their consideration of the success and harm factors. *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131–32 (9th Cir.2011)(continuing to apply the sliding scale approach after *Winter*). Under this approach, "[f]or example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Id.* Plaintiff, therefore, need only raise "serious questions going to the merits," so long as it can demonstrate that the balance of hardships tips sharply in their favor. *Id.* at 1135. However, no "thumb on the scales is warranted" in an environmental case. *Monsanto Co. v. Geertson Seed Farms,* —— U.S. ——, 130 S.Ct. 2743, 2757, 177 L.Ed.2d 461 (2010)(NEPA case).

**B.  Discussion**

Plaintiff asserts that it will likely succeed on the merits, due to the Forest Service's failure to take a "hard look" at the direct, indirect and cumulative impacts to the aquatic environment that is required by NEPA and its implementing regulations. 40 C.F.R. § 1500.1 et seq. For example, the Forest Service failed to disclose and analyze key baseline information regarding stream temperature and steam flow. The Forest Service failed to provide an analysis that ensures compliance with the applicable standards designed to protect aquatic life in the Deschutes National Forest and state water quality standards.

Specifically, when the Forest Service prepared the Environmental Assessment ("EA") for this Project, it incorporated the work done by the City of Bend's independent contractor HDR. HDR relied on the Heat Source model to forecast the increase in stream temperatures resulting from the Project. HDR modified the model, used temperature data from 1923 to 1987 and then used it to forecast temperatures year-round into the future.

On the other hand, plaintiff retained hydrogeologist Mark Yinger to review HDR's work. Yinger submitted extensive comments into the record underscoring the problems with HDR's approach and how that approach rendered the critical temperature predictions unreliable. Neither HDR nor the Forest Service explained how the model was recalibrated and made suitable for use in forecasting year-round water temperatures. The Forest Service did not address the controversy over HDR's modeling work in the EA, nor did it disclose the basis for allowing HDR to use the model in a manner for which the model had not been calibrated. Plaintiff argues that the Forest Service cannot demonstrate that it has taken a hard look at the Project and disclosed its impacts on the environment and met its obligations. This failure is critical here because the Forest Service relied on the Heat Source model to predict the likely increases in water temperature caused by the Project and to support its claim that the Project complied with substantive protections for aquatic life. Yinger asserts that the Heat Source model was created and calibrated by the Oregon Department of Environmental Quality only for use during a three week period in the summer of 2001. There is no evidence that the Heat Source model was designed for use to forecast complex data sets, including complete annual data. Therefore, plaintiff argues, the Forest Service cannot rely on HDR's work to meets its obligation under NEPA to take a hard look at the direct, indirect and cumulative impacts of the Project or to

demonstrate compliance with applicable Forest Plan standards under the NFMA.

■ Moreover, the Forest Services seems to admit that the Heat Source modeling fails to show whether applicable water quality standards are met when it stated that the model's "temperature predictions are effective for analyzing the relative temperature differences between alternatives, but the range of temperatures does not fall within the range of what would be an expected measured temper a cure change in the field, since the model';s accuracy is approximately +/- 1 degree [Celsius]." EA at 3–66.

In other words, the model may provide a comparison between the alternatives but the model does not accurately predict water quality impacts as required by state water quality standards. The model output lacks the accuracy necessary to determine compliance with applicable water quality standards.

■ Even if this court were to assume that the Forest Service's application of the Heat Source model does not violate the law, the Forest Service admits violations of the Inland Native Fish Strategy ("INFISH") water quality standards in the EA. The INFISH amended the Deschutes National Forest Land and Resource Management Plan ("LRMP") with respect to water quality. The goal of the INFISH guidelines are to "maintain and restore" riparian resources, ecosystem health and fish populations. The Forest Service predicts temperatures exceeding 9 degrees Celsius during this "likely" spawning and rearing period throughout Tumalo Creek. The standard under INFISH is not to "retard attainment of water quality standards." It is not enough for the Forest Service to simply conclude that there is no or little impact to the water temperature due to the Project without supporting reasoning, analysis, and data. *See Marble Mountain Audubon Soc. v. Rice,* 914 F.2d

179, 182 (9th Cir.1990) ("An agency must set forth a reasoned explanation for its decision and cannot simply assert that its decision will have an insignificant effect on the environment."). Specifically, the INFISH standard requires the Forest Service to not retard the stream by ensuring "maximum water [temperature] below 59 degrees F within adult holding habitat and below 48 degree F within spawning and rearing habitats." While the Forest Service asserts in the EA that it is in compliance with INFISH, the Forest Service acknowledges the period of greatest concern for water temperatures is July through September. The Forest Service states that the proposed Project has "the capacity to divert and transmit larger flow volumes in response to greater demand" and that there is "a potential for decreased in stream flow and increased water temperatures during critical times of the year." Bloemers Decl., Exh. 13 at 30. The potential impact that is anticipated is "increased water temperatures" during the summer months. "Approximately 15–20 years out, projected demand will require delivering at the maximum rate of 21 cfs." Bloemers Decl., Exh. 14 at 7. "With decreased flow, temperatures would be expected to trend in an upward direction." Bloemers Decl., Exh. 13 at 31. The Forest Service states that, "[t]he 7 day maximum water temperatures exceed the 59 degree F (15 degree C) adult fish holding habitat water temperature objective in some years under current conditions." Bloemers Decl., Exh. 14 at 7. The Forest Service also admits that: "[t]he 48 degree F (8.9 degree C) water temperature RMO for spawning and rearing habitat ... is not met for the summer months under existing conditions." *Id.* The Forest Service states that the change in stream flow (if the system is run at 21 cfs) is not expected to result in any measurable increases or decreases in temperature "during the cold months." Bloemers

Decl., Exh. 14 at 7. So, while the Forest Service predicts increases in temperatures resulting from the increased use of water, the Forest Service does not make any conclusion regarding the effect of increased water withdrawals during the "critical summer months" and whether the Project will violate or comply with IN-FISH standards during those summer months. Instead, the Forest Service simply concludes that the Project will "not retard or prevent attainment of the water temperature RMO." Bloemers Decl., Exh. 14 at 7.

The Forest Service's conclusions contradict themselves and the evidence in the record. The record supports plaintiff's likelihood of success on the merits in that the Project will result in violations of IN-FISH standards for water quality.

■ Finally, the Forest Service failed to utilize the baseline to predict temperature changes resulting from the Project. To comply with NEPA's "hard look" mandate, courts have held that agencies are obligated to maintain a current inventory of resources so that an adequate baseline exists to evaluate the environmental impacts of a proposed action. It is against baseline information that environmental impacts are measured and evaluated; therefore, it is critical that the baseline be accurate and complete. *Ctr. for Biol. Diversity v. Bureau of Land Mgmt.*, 422 F.Supp.2d 1115, 1163 (N.D.Cal.2006) (citing *Am. Rivers v. Fed. Energy Regulatory Comm'n*, 201 F.3d 1186, 1195, n. 15 (9th Cir.1999)).

In preparing the EA and analyzing the impact of the Project on temperatures and flows in the Creek, the Forest Service relied on a report prepared by HDR that used stream temperature data that was more than 25 years old. Bloemers Decl., Exh. 1 (EA at 3–38); Exh. 11 at 6, 8. The Forest Service had more recent baseline data available to it, but stated that the older data was adequate and that newer

data was measured at different points. Bloemers Decl. Exh. 16 at 6. Given the Forest Service's own admission that lower flows mean higher temperatures, and that during the last 25 years, the Creek endured greater temperatures and more extreme droughts, using more recent data would likely have been worse for the Creek than HDR predicted. The Forest Service failed to take a hard look and disclose the Project's impacts consistent with NEPA's requirements.

Plaintiff has raised serious questions about whether the Forest Service has ensured the Project complies with NFMA, NEPA and the CWA. The Forest Service did not disclose the environmental baseline and relied on a consultant's modification of a temperature model without requiring the model to be re-calibrated as directed by the Oregon Dept of Environmental Quality. The Forest Service's own admissions demonstrate the Project is not in compliance with INFISH and that its approach cannot provide the measurements required by the applicable Forest Plan standards.

■ Moreover, the immediate implementation of the Project will irreparably harm plaintiff and its members and supporters that use and enjoy the area at issue for its aesthetics, recreation such as hiking, camping, fishing, and photography, as well as watershed research, education and observing wildlife. Plaintiff and its members will further be harmed because the Project will degrade water quality, diminish aesthetic values and harm fish and wildlife in and around the Project area. "Environmental injury, buy its nature ... is often permanent or at least of long duration, i.e., irreparable." *Alliance for the Wild Rockies*, 632 F.3d at 1134–35. Further, "[p]reserving nature and avoiding irreparable environmental injury" is in the public interest. *Id.* at 1138.

**1198**

 · Where, as here, many questions cannot be resolved at the hearing for an injunction and the court perceives a need to preserve the status quo and prevent harm to the parties, the "serious question" doctrine applies. *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988). "Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" *Id.* (internal citation omitted). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *Id.* (quoting *National Wildlife Fed'n v. Coston,* 773 F.2d 1513, 1517 (9th Cir.1985)). This is exactly the situation at bar, because serious questions remain, and the court cannot resolve these questions on the merits with the information presently before it, a preliminary injunction is warranted until briefing on the merits occurs.

### C. *Bond*

 No bond shall be required. It is well established that in public interest environmental cases the plaintiff need not post bonds because of the potential chilling effect on litigation to protect the environment and the public interest. Federal courts have consistently waived the bond requirement in public interest environmental litigation, or required only a nominal bond. *See People of State of Calif. ex rel. Van de Kamp v. Tahoe Regional Planning Agency,* 766 F.2d 1319 (9th Cir.1985) (no bond required).

### CONCLUSION

Based on the record before this court as well as the parties' oral arguments, evidence and witness testimony, plaintiff's motion for a preliminary injunction (doc. 11) is granted.

IT IS SO ORDERED.