In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 18-2327

MOUNTAIN CREST SRL, LLC,

*Plaintiff-Appellant*,

*v.*

ANHEUSER-BUSCH INBEV
SA/NV, individually and as
successor to InBev SA/NV and
Interbrew S.A., et al.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:17-cv-00595-jdp — **James D. Peterson**, *Chief Judge*.

_____

ARGUED NOVEMBER 2, 2018 — DECIDED SEPTEMBER 5, 2019

_____

Before RIPPLE, KANNE, and ROVNER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Mountain Crest SRL, LLC ("Mountain Crest"), brought this action, alleging that Anheuser Busch InBev SA/NV ("Anheuser-Busch") and Molson Coors Brewing Company ("Molson Coors") had conspired to damage Mountain Crest's beer exports to Ontario, Cana-

da, in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2. Mountain Crest also alleged that Anheuser-Busch and Molson Coors were enriched unjustly in violation of Wisconsin law.

Much, although not all, of this dispute centers around two agreements: an agreement in 2000 between two Canadian entities, Brewers Retail, Inc. ("BRI"), and the Liquor Control Board of Ontario ("LCBO"); and an agreement in 2015 between Anheuser-Busch, Molson Coors, BRI, the LCBO and the government of Ontario. Mountain Crest alleged that Anheuser-Busch and Molson Coors had conspired to restrain trade in the Ontario beer market and had engaged in monopolistic behavior through the two agreements. Among other things, Anheuser-Busch and Molson Coors carried on a group boycott to force the LCBO to enter the agreement in 2000 to ensure that BRI, an entity Anheuser-Busch and Molson Coors control, was the only retailer in Ontario selling beer in packages larger than six containers. Mountain Crest further claimed the conspiracy extended into 2014 and 2015 when Anheuser-Busch and Molson Coors used a variety of tactics to continue the retail arrangement between BRI and the LCBO, including a threat to bring expropriation litigation under the North American Free Trade Agreement ("NAFTA"). Mountain Crest contends that these agreements, as well as BRI's policy of promoting sales of Anheuser-Busch's and Molson Coors' products in its stores to the detriment of American competition, inhibited its ability to compete in the Ontario beer market.[1]

---

[1] Mountain Crest submitted that the alleged anticompetitive conspiracy prevents it from competing in the Ontario market because its profits are

(continued … )

Anheuser-Busch and Molson Coors moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) on multiple grounds. The district court ruled that the act of state doctrine required dismissal of the federal claims and granted the motion; it did not address Anheuser-Busch and Molson Coors' other grounds for dismissal of the federal claims.[2] The district court then relinquished supplemental jurisdiction over the state-law unjust enrichment claim and dismissed the case without prejudice to Mountain Crest's bringing that claim in state court. Mountain Crest timely appealed.[3] For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the district court and remand the case for proceedings consistent with this opinion.

## I.

## BACKGROUND

### A.

Mountain Crest is an independently owned brewery based in Monroe, Wisconsin. In 2009, Mountain Crest began

---

( … continued)

driven by economies of scale, achieved by distributing large packages of beer.

[2] The district court's jurisdiction is predicated on 28 U.S.C. §§ 1331, 1337, and 1367. We note that, although Mountain Crest does not specifically invoke 28 U.S.C. § 1332, the facts alleged in the Second Amended Complaint appear to establish that the district court also had diversity jurisdiction over Mountain Crest's state-law claim.

[3] We have jurisdiction pursuant to 28 U.S.C. § 1291.

exporting its beer to Ontario, Canada, seeking to compete in the low-value segment of the beer market there.

The Second Amended Complaint alleges[4] that Anheuser-Busch is a corporation organized under the laws of Belgium and headquartered there.[5] Labatt, a Canadian brewery, is currently a subsidiary of Anheuser-Busch, and through Labatt, Anheuser-Busch has about a forty-three percent market share in the Canadian beer market. Mountain Crest claims that senior executives based out of St. Louis, Missouri, manage Labatt through its "North America" zone and that they and their predecessors oversaw and were involved intimately in the alleged antitrust conspiracy.

Molson Coors is a Delaware corporation with principal places of business in Denver, Colorado, and Montreal, Quebec. Molson Coors is the product of a 2005 merger between Molson, Inc. and the Adolph Coors Company. According to Mountain Crest, Molson Coors' Canadian subsidiary, Molson, controls roughly thirty-four percent of the Canadian beer market. Mountain Crest alleges that Molson Coors' senior executives participated in the alleged conspiracy with Anheuser-Busch and its predecessors and acted to ensure the conspiracy's continued operation.

---

[4] This suit comes to us on a motion to dismiss. Therefore, the events described are as outlined in Mountain Crest's Second Amended Complaint.

[5] Anheuser-Busch was formed when Belgian-based InBev SA/NV acquired the St. Louis-based Anheuser-Busch Company in 2008. InBev was the product of a 2004 stock-for-stock merger between Belgian-based Interbrew S.A. and Brazilian-based AmBev. One of Interbrew's subsidiaries was Labatt Breweries of Canada, which Interbrew acquired in 1995.

Under a Canadian law, the provinces regulate and control the sale of alcohol within their boundaries.[6] Under this scheme, the LCBO, a Crown agency wholly owned by the government of Ontario, has the authority to control the importation of beer, wine, and spirits into Ontario, and to determine the "nature, form and capacity of all packages to be used for containing liquor to be kept or sold." Liquor Control Act, R.S.O. 1990, c. L.18 § 3(j) (Can.).[7] It is further authorized, by statute, to operate retail alcohol stores across the province. *Id*. § 3(d).

At the time relevant to this suit, Ontario's Minister of Consumer and Commercial Relations had oversight of the LCBO. As such, "[t]he LCBO was expected to implement Governmental policy with regard to the distribution and sale of alcohol within the parameters set out by the *Liquor Control Act* and related legislation." *Hughes v. Liquor Control Bd. of Ontario*, 2018 CarswellOnt 3969, para. 84 (Can. Ont. S.C.J.) (WL), *aff'd* 145 O.R.3d 401 (Can. Ont. C.A.). Thus, "[t]he government exercised considerable control over the LCBO" and "[c]omplex, high-level decisions were made from time-to-time by the senior Government officials or in some

---

[6] *See, e.g.*, The Importation of Intoxicating Liquors Act, R.S.C. 1985, c. I-3, § 3 (Can.) (federal statute that, with limited exceptions, bans any interprovincial or international trade in alcoholic beverages other than as carried out by provincial liquor boards); *R. v. Canadian Breweries Ltd.*, [1960] O.R. 601, para. 39 (Ont.) ("It requires no exhaustive analysis of the constitutional authorities to state that each Province has jurisdiction to regulate and control the sale of liquor within its boundaries and to fix the prices at which, and the conditions under which liquor may be sold.").

[7] *See also* R.S.C. 1985, c. I-3 § 3.

cases, through the enactment of legislation by the Legislative Assembly that directed the activities of the LCBO." *Id.*

BRI is a cooperative of Ontario brewers, authorized by the LCBO to serve as a beer distributor, wholesaler, and retailer in Ontario. Under the Liquor Control Act, the LCBO controls the sale and delivery of beer at BRI stores and establishes specific terms and conditions related to the operation of such stores. *See* R.S.O. 1990, c. L.18 §§ 3(1)(d), 3(1)(e.1), 3(1)(e); Sale of Liquor in Government Stores, O. Reg. 232/16 § 6 (Can.). Mountain Crest alleges that Labatt and Molson gained control of BRI over many years by acquiring original members of the cooperative; that each now owns forty-nine percent of BRI[8]; and that some of their employees serve as BRI directors. BRI sells beer in stores known as The Beer Store and allegedly enjoys a seventy-five percent market share of beer sales in the province.[9]

In sum, there are two places to buy beer in Ontario: LCBO stores and The Beer Store. The LCBO operates three

---

[8] Sleeman Breweries, Ltd. ("Sleeman"), a subsidiary of the Japanese brewery Sapporo Ltd., also had an ownership stake in BRI for much of the relevant time. Sleeman, however, had minimal influence over BRI's operations and was not included in any BRI board proceedings or actions involving the negotiation of the agreement in 2000 between BRI and the LCBO.

[9] The Beer Store generally does not display its inventory on the open floor. Rather, customers place orders at the cashier, and the order is retrieved from the back-of-house. The inventory is listed on a board behind the cashier, and brewers that are not part of BRI must pay an up-front listing fee to have their product identified on the board. Listings can be removed if the beer does not meet sales quotas established by BRI.

different types of stores. "Ordinary" stores are in larger communities where BRI operates The Beer Store. Consistent with historical practice, LCBO "ordinary" stores sell wine and spirits as well as beer in packages of six or fewer, while BRI is responsible for selling large packages of beer. LCBO "combination" stores, by contrast, sell beer in packages larger than six, as well as wine, spirits, and small packages of beer, because they are in smaller communities that do not have The Beer Store. Under this arrangement, as a community grows, BRI can request to open a store in the locality; if the LCBO grants that request, the LCBO combination store reverts to an ordinary store. LCBO "agency" stores serve Ontario's smallest communities; these stores are private businesses such as grocery stores that are permitted to sell alcohol.

Beyond selling different package sizes of beer, BRI and the LCBO traditionally sold different types of beer. LCBO ordinary stores sold imported beer and some beer brewed in Ontario; The Beer Store only sold beer brewed in Ontario. Additionally, LCBO ordinary stores did not distribute any beer brands sold by BRI to restaurants and bars holding alcohol licenses. Since The Beer Store allegedly had a seventy-five percent market share and only sold domestic products, most of the beer sold in Ontario was brewed in Ontario. In the late 1980s and early 1990s, the United States, invoking the General Agreement on Tariffs and Trade ("GATT"), complained that these practices were discriminatory and, as a result of the settlement in 1993, foreign brewers were permitted to sell their beer in The Beer Store. Foreign brewers

could also access BRI's large beer distribution network.[10] The settlement did not affect the LCBO's practice of selling beer in packages of six or fewer in its ordinary stores.

As the GATT challenge was settled, disputes began to emerge between the LCBO and BRI. Pertinent to the present case, the LCBO expressed a desire to begin selling larger packages of beer in its ordinary stores. BRI and Brewers of Ontario, an unincorporated trade association consisting solely of Labatt and Molson, opposed this plan because such sales would "cannibalize BRI's volume."[11] This dispute and its resolution is central to many of Mountain Crest's claims; the events described here are as outlined in Mountain Crest's Second Amended Complaint.

Responding to the LCBO's wish to sell larger packages of beer, the Executive Director of Brewers of Ontario noted in a 1992 letter to the President of BRI that the GATT settlement required the LCBO to provide the same opportunities to foreign brewers that it provided to domestic brewers. Therefore, Labatt and Molson believed that they would not be able to sell large packages of their own beer in LCBO ordinary stores without opening those stores to large packages of foreign beer. Accordingly, they refused to sell packages of twelve and twenty-four containers of beer at LCBO ordinary

---

[10] Historically, the LCBO has taken first receipt of all foreign beer and then sells it to BRI for sale and distribution. Mountain Crest submits that, though the LCBO takes first receipt of all foreign beer for BRI, it is BRI that places the orders for imported beer.

[11] R.49-2 at 1.

stores. Mountain Crest submits that this "group boycott"[12] put LCBO "at the mercy of Labatt and Molson if it wished to expand its beer business" because the two brewers had a dominant market share in Canada and exclusive distribution agreements with the three major American beer companies.[13] At times, the LCBO's internal documents reflected its view that BRI was monopolistic and its practices harmed Canadian consumers.

According to the Second Amended Complaint, the LCBO had to negotiate with Labatt and Molson if it wanted to sell larger packages of beer. These negotiations, which involved Ontario's Minister of Consumer and Commercial Relations, occurred over the next several years. In addition to what size packages of beer could be sold, the parties also discussed cost-of-service fees, minimum beer prices, additional locations of The Beer Store and LCBO stores, and BRI's assumption of the responsibility for directly importing the beer it sells rather than using the LCBO as a go-between.

On December 9, 1998, officers of Molson and Interbrew (which now owned Labatt) presented a template working

---

[12] *See* R.49 ¶ 108. In their briefing before the district court, Anheuser-Busch and Molson Coors note that any decision to not provide large packages of beer to LCBO ordinary stores complied with the status quo—the traditional practice of LCBO ordinary stores to only sell packages of six or fewer. Mountain Crest submits, however, that the boycott extended beyond not providing larger package sizes of domestic beers but also included "unwillingness to supply additional six-packs" and "alternative packaging formats (e.g. cans)." R.49-16 at 1; *see also* R.49 ¶ 108.

[13] R.49 ¶ 77.

agreement addressing the points of contention. This template included a provision prohibiting the LCBO from purchasing twelve and twenty-four packages of beer from any American brewers, including those brewers who did not sell through BRI. In a letter to the Deputy Minister of Consumer and Commercial Relations, the LCBO opposed this provision and others. Pertinently, it complained that the template working agreement did not address BRI's practice of placing frequent small orders for imported beer. Mountain Crest suggests that this practice—in its words, "out-of-stocking"—inhibited its ability to sell beer competitively in Ontario.[14] Relatedly, the LCBO requested that BRI undertake importation and distribution operations for itself rather than relying on the LCBO to import and distribute beer to BRI in the first instance. Mountain Crest submits that making this change would have remedied the out-of-stocking issues it allegedly faced later on.

Following the initial template proposal, the LCBO and the breweries developed a document that would become a final agreement in 2000. This "Working Protocol"[15] included provisions prohibiting the LCBO from selling twelve and twenty-four packages of beer and requiring BRI to take first receipt of the imported beer. Mountain Crest alleges that the Ontario government pressured the LCBO to "concede to demands from Molson and Labatt, although the Minister, sensitive to international trade legal exposure, declined to do

---

[14] *See id.* ¶¶ 101–02.

[15] *See id.* ¶ 102.

so via any form of law or regulation."[16] According to Mountain Crest, the breweries promised to make new investments in manufacturing if the LCBO acceded to their demands. At one point, the LCBO officials expressed that the Working Protocol "gives the Brewers [Molson, Inc. and Interbrew SA] almost a total monopoly over the beer market and effectively supersedes the Liquor Control Act and the powers it gives the Board in relation to beer."[17]

As negotiations continued, the LCBO apparently still sought to gain some flexibility in package sizes. During an LCBO Board meeting on August 9, 1999, the LCBO discussed the possibility that Molson might be interested in working with them to improve the proposed agreements. Molson, however, did not do so. The brewers allegedly continued what Mountain Crest terms as their "multi-year group boycott": Labatt and Molson refused to supply additional six packs of beer beyond what the LCBO already had, to provide packages of their beer in cases larger than a six pack, or to provide any beer in cans.[18]

A final round of negotiations began on March 30, 2000. Minutes from the meeting reflect that the brewers viewed allowing larger package sizes in LCBO stores to be "Non-Negotiable."[19] The minutes also indicate that the par-

---

[16] *Id.* ¶ 103.

[17] *Id.* ¶ 105 (alteration in original).

[18] *Id.* ¶ 108.

[19] *Id.* ¶ 112.

ties decided to not include the provision from the Working Protocol that would have required BRI to assume import-distribution responsibilities. This provision, according to Mountain Crest, would have fixed the out-of-stocking issue it allegedly later faced when trying to sell its beer at The Beer Store. Mountain Crest submits that, on May 18, 2000, the LCBO Board determined that, "as a practical matter," it would have to concede to the brewers' demands because "the LCBO could not compel [BRI] to supply it with new brands of beer for sale."[20] At the end of that month, the Minister for Commerce and Commercial Relations directed the LCBO to sign the agreement proposed by BRI. BRI's Chairman, also an officer of Molson, signed the contract on behalf of BRI. According to Mountain Crest, the parties chose to implement the regulatory scheme through a contract between the LCBO and BRI because a contract would not be public.[21] Further, Mountain Crest asserts that Labatt and Molson's lawyers believed that "the Cabinet or Ministerial directive approach" might not "prevent the LCBO from using their regulatory power under the Liquor Control Act to override any such a directive."[22]

On June 1, 2000, BRI and the LCBO entered into a final agreement (the "2000 Agreement") to resolve the outstand-

---

[20] *Id.* ¶ 119.

[21] Indeed, though Sleeman has a small ownership stake in BRI, it apparently was unaware of this agreement at the time it was signed. Similarly, Mountain Crest alleges that other brewers were unaware of the arrangement.

[22] *Id.* ¶ 111.

ing issues of dispute between the two parties. Relevant to this suit, the 2000 Agreement outlined "Beer Selling Roles" and provided that, "[c]onsistent with historical practice, the LCBO will not sell beer [] in non-combination stores in packages containing more than 6 containers and will not promote beer at price points greater than 6 containers"[23] (the "six-pack rule"). According to the Second Amended Complaint, "[i]n one sentence, Molson Inc. and Interbrew SA managed to implement not only their per se illegal horizontal market allocation conspiracy regarding package sizes, but also their per se illegal horizontal price fixing conspiracy by contractually prohibiting the LCBO from offering 'Pack Up Pricing.'"[24] In Mountain Crest's view, a prohibition on promoting beer at price points greater than six containers "meant that U.S. brewers who only sold to the LCBO were unable to encourage sales to the LCBO by offering promotional quantity-based pricing to match discounts Defendants made available at [The Beer Store]."[25] A Canadian court has explained that the 2000 Agreement merely continued current practices of the LCBO and BRI:

> The 2000 Beer Framework Agreement did not change much in the way that the LCBO and Brewers Retail each operated. … Both before and after the Agreement was adopted, government policy precluded the LCBO from sell-

---

[23] R.49-19 at 4.

[24] R.49 ¶ 122.

[25] *Id.*

ing 12-packs and 24-packs at Ordinary Stores and precluded the LCBO from selling to licencees the beer that was exclusively distributed by Brewers Retail. The LCBO would have needed the Provincial Government's approval to change this *status quo*, and the Government refused to grant such approval.

*Hughes*, 2018 CarswellOnt 3969, para. 157.

Mountain Crest alleges that the LCBO made efforts to renegotiate the 2000 Agreement over the next several years so that it could sell larger packages of beer. For example, the LCBO offered to allow pack-up pricing for Labatt and Molson products only, which presumably would benefit Labatt and Molson at the expense of their competitors. The BRI, however, rejected these entreaties and brewers allegedly took steps to ensure the status quo continued. During this time, both Anheuser-Busch and Molson Coors were formed through a variety of acquisitions and mergers that included Labatt and Molson respectively. Mountain Crest suggests that the profits Labatt and Molson enjoyed from their allegedly anticompetitive and illegal scheme made such corporate combinations possible.

On October 20, 2009, Mountain Crest entered the Ontario market and paid BRI to list its Boxer Lager brand in The Beer Store. In total, Mountain Crest paid $701,797.08 CAD in listing fees from the date of that initial listing until the end of 2016.[26] Mountain Crest, however, allegedly had difficulties

---

[26] A listing fee refers to the price that brewer pays BRI to carry the brewer's beer.

selling its beer in The Beer Store. In a February 22, 2010 press release, Mountain Crest reported that its launch of Boxer Lager was "severely hindered with rolling Out of Stocks."[27] According to Mountain Crest, BRI placed small orders for Boxer Lager even though there was great demand for the product due to an advertising campaign. And, since The Beer Store was the only place that Mountain Crest could sell its large packages of Boxer Lager, Mountain Crest claims that it lost export sales because it could not go to another retailer and sell its beer in large packages there. Mountain Crest alleges that the beneficiaries of these lost sales were Anheuser-Busch's and Molson Coors' value-segment beer brands that were prominently displayed in The Beer Store. BRI responded to Mountain Crest's press release, claiming that "[w]e're not seeing that inventory arrive in stores. We're at the mercy of what the LCBO ships to us."[28] Mountain Crest contends that this was misleading because BRI resisted the LCBO's attempt to move import distribution to BRI and "Molson and Labatt had used their market power to completely dominate the LCBO."[29]

Mountain Crest alleges other facts detailing anticompetitive marketing and distribution practices at The Beer Store. Allegedly, "the most significant consumer marketing vehicle

---

[27] *Id.* ¶ 174; s*ee also id.* ¶ 173 ("Plaintiff's winter 2009-2010 advertising campaign and launch of Boxer was significantly undermined by out-of-stock issues for Boxer Lager that on average affected a third of the 440 [The Beer Store's] that were supposed to be carrying Boxer Lager.").

[28] *Id.* ¶ 176.

[29] *Id.*

in" The Beer Store is the "Big Ten" wall, which prominently lists "the top 10 selling beer brands" for customers to choose when placing their orders.[30] All but one of the brands listed on the "Big Ten" wall allegedly belonged to either Anheuser-Busch or Molson Coors, which "reinforce[d] their existing volumes and market share while limiting the ability of new entrants to compete."[31] Additionally, The Beer Store operated a "Brewer Poster Program"[32] that brewers could join to place large advertising posters inside The Beer Store, with relative positions selected by The Beer Store. Mountain Crest alleges that it paid to participate in this program, but The Beer Store discontinued the program summarily, without refund, to utilize the space for The Beer Store brand messaging. Last, Mountain Crest claims that The Beer Store's listing fees, which are charged to only brewers who are not members of BRI, are discriminatory.[33] The effect of these fees was apparently compounded by the alleged out-of-stocking scheme because "Defendants' employees, who take Director roles at [BRI], decide amongst themselves" quotas that the brewer's brands must meet for The Beer Store to retain inventory of that product "even if the reason it did not meet

---

[30] *Id*. ¶ 59. For a description of the typical layout of The Beer Store and the customer purchasing process, *see supra* note 9.

[31] *Id*. ¶ 247.

[32] *Id*. ¶ 169.

[33] Until 2015, BRI consisted only of Anheuser-Busch, Molson Coors, and Sleeman. Thus, all other brewers paid listing fees.

the quota is because [BRI] did not use reasonable efforts to ensure sufficient inventory despite the paid-for listing."[34]

In 2014, the Ontario Premier asked the Premier's Advisory Council on Government Assets to examine further ways to monetize government assets such as the LCBO. The Council determined that the LCBO should sell larger packages of beer and that BRI needed to "treat both owners and non-owners fairly, including with respect to the display of their products."[35] Around the same time, the *Toronto Star* published an article disclosing the previously non-public 2000 Agreement, sparking constituent outrage and leading to a since-dismissed Canadian antitrust class action suit.[36] BRI responded to this public criticism by offering ownership stakes to all Ontario brewers. Though small, these ownership stakes allowed Ontario brewers special privileges such as being exempt from paying listing fees. Mountain Crest alleges this plan was "in effect an import-substitution scheme … giving Ontario-based brewers better access to [The Beer Store] while further damaging competition [from] Defendants' U.S. based competitors, and with the intent of forestalling government mandated reforms [aimed] at ending Defendants' ongoing restraints in trade."[37]

---

[34] *Id*. ¶ 62.

[35] *Id*. ¶ 188 (emphasis omitted).

[36] *See Hughes*, 2018 CarswellOnt 3969, para. 247 (determining that the 2000 Agreement did not violate Canada's Competition Act because the conduct alleged was regulated conduct).

[37] R.49 ¶ 195.

At the same time, Anheuser-Busch, Molson Coors, BRI, the LCBO, and the government of Ontario entered into negotiations to replace the 2000 Agreement. During these negotiations, Anheuser-Busch and Molson Coors apparently sought to maintain BRI's exclusive position as the only seller of large packages of beer. To this end, they allegedly threatened the Ontario government with NAFTA expropriation litigation if the government "took steps to undermine their cartel or system of restraints on U.S. exports to Ontario."[38] According to Mountain Crest, these threats "were planned and authorized by Defendants['] respective U.S. offices in St. Louis and Denver" because "[n]o subsidiary entity of either Defendants located in Canada is capable of standing under NAFTA to bring an expropriation challenge, which is designed to offer a remedy solely for foreign entities, not domestic entities."[39]

The final 2015 Agreement continued the six-pack rule. It also included a provision wherein Anheuser-Busch and Molson Coors "waive any right to bring any claim or to seek or obtain any compensation or other remedy of any kind under international law or under any international trade agreements to which Canada is a Party, including [NAFTA]."[40] The 2015 Agreement has a ten-year term and

---

[38] *Id.* ¶ 200. NAFTA permits investors to submit claims that a NAFTA party has breached investment-related obligations, including obligations to afford fair treatment to investments made by foreign parties. *See* North American Free Trade Agreement, ch. 11 § B, Dec. 8–17, 1992, 107 Stat. 2061, 32 I.L.M. 605.

[39] R.49 ¶ 200.

[40] *Id*. ¶ 207.

provides for early termination upon either written agreement by both BRI and the government of Ontario, the bankruptcy of BRI, or material breach by either party. Further, it contains a provision permitting severance of terms "restricted, prohibited or unenforceable" in any jurisdiction.[41] The government of Ontario, BRI, Labatt, Molson, and Sleeman Breweries, Ltd. ("Sleeman")[42] signed the 2015 Agreement. Along with the 2015 Agreement, the government of Ontario amended the Liquor Control Act. This amendment states that the LCBO "is deemed to have been directed, and Brewers Retail, Inc.[,] is deemed to have been authorized, to enter into the June 2000 framework in relation to the Crown's or a Crown agent's regulation and control of the sale of beer in Ontario." R.S.O 1990, c. L.18 § 10(3).

After the May 2018 elections, the Ontario PC party formed a new parliamentary majority in the Ontario government. As part of its campaign platform, it had said that it would "withdraw from the secret, backroom deal negotiated between the Liberals and foreign multinational beer companies."[43] After oral argument in this case, the new Ontario government proposed and enacted an amendment to the Liquor Control Act terminating the 2015 Agreement.[44] The

---

[41] *Id.*

[42] Sleeman was the other owner-member of BRI. *See supra* note 8.

[43] Appellant's Br. 14.

[44] *See* Bill 115, *Bringing Choice and Fairness to the People Act (Beverage Alcohol Retail Sales)*, 1st Sess., 42nd Leg., Ontario, 2019 (royal assent received June 6, 2019).

effective date of the termination is to be announced by the province's Lieutenant Governor; this date has not yet been announced. In a May 27, 2019 letter, counsel for Labatt and Molson informed the Ontario Deputy Attorney General that the companies were reserving the right to commence litigation challenging the bill. No such litigation has yet commenced.

## B.

On August 17, 2017, Mountain Crest brought this action in the Western District of Wisconsin. It alleged violations of the Sherman Antitrust Act as well as a claim for unjust enrichment under Wisconsin state law. Specifically, under § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Mountain Crest alleges that Anheuser-Busch and Molson Coors engaged in a horizontal conspiracy to restrain competitors' export of beer to Ontario by "leverag[ing] their market power to insist … that LCBO not purchase 12s and 24s of beer from any breweries"[45]; "agree[ing] to impose on the LCBO a contractual obligation in the June 1st, 2000 agreement that the LCBO would not allow any brewery supplier to offer Pack-Up pricing"[46]; "conspir[ing] to rig [The Beer Store] in-store marketing schemes … to reinforce their existing volumes and market share while limiting the ability of new entrants to compete"[47]; and "conspir[ing] to hold on to their restraints

---

[45] R.49 ¶ 243.

[46] *Id*. ¶ 244.

[47] *Id*. ¶ 247.

against their U.S. domestic competitors' ability to export to Ontario by launching their January 2015 Plan to extend certain cartel benefits to other Ontario brewers and threatening the government of Ontario with NAFTA litigation."[48] To support its claim under § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, Mountain Crest contends that Anheuser-Busch and Molson Coors "conspired with each other to monopolize the sale of beer in Ontario, including the use of a group boycott, to restrain the LCBO's ability to buy beer from other brewers."[49] They also "took overt and predatory acts in furtherance of their conspiracy by developing a series of ever-more anticompetitive restraints on the LCBO's ability to offer American brewers a competitive route into the Ontario beer market."[50] These overt and predatory acts included "rebuffing LCBO attempts to engage competitively" and "operat[ing] [The Beer Store] in a manner that constitutes an unlawful combination by discriminating against competing brewers" so that they cannot access "point-of-sale marketing programs in [The Beer Store]."[51]

For these alleged violations of the Sherman Act, Mountain Crest sought a declaration that Anheuser-Busch and Molson Coors engaged in an "ongoing *per se* unlawful market allocation and price fixing conspiracies to restrain export

---

[48] *Id.* ¶ 243.

[49] *Id.* ¶ 253.

[50] *Id.*

[51] *Id.*

beer trade to Ontario."[52] Further, it asked for a declaration that Anheuser-Busch and Molson Coors sought to monopolize illegally the sale of beer in Ontario by restraining the ability of the LCBO to purchase beer from competing breweries and by creating anticompetitive conditions in The Beer Store. Mountain Crest also moved for injunctive relief ordering Anheuser-Busch and Molson Coors to terminate their participation in the 2015 Agreement and to restrain any further efforts aimed at preventing "any third party Canadian entity involved in the purchase and resale of beer" from purchasing competing beer.[53] Additionally, Mountain Crest sought an order requiring Anheuser-Busch and Molson Coors to divest their ownership in BRI. Last, Mountain Crest requested treble damages for its lost exports to Ontario.

Anheuser-Busch and Molson Coors moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) on multiple grounds: (1) that the claims are barred by the act of state doctrine; (2) that the claims are barred under *Noerr-Pennington*; (3) that the Sherman Act does not reach the conduct at issue; (4) comity; (5) *forum non conveniens*; (6) that Mountain Crest did not state a plausible claim; and (7) that Mountain Crest did not plead facts to pierce the corporate veil of their subsidiaries to reach them.

Relying on the act of state doctrine, the district court granted Anheuser-Busch's and Molson Coors' motion. It reasoned that "all of the conduct that allegedly violates the Sherman Act involves a public act by the Ontario govern-

---

[52] *Id.* ¶ 257.

[53] *Id.*

ment and [that] a ruling in Mountain Crest's favor would require the court to determine that the Ontario government violated the Sherman Act as well."[54] The district court identified four such public acts that were "the official policy of the Ontario government": (1) the 2000 Agreement between the LCBO (as a government agency) and BRI formalizing the six-pack rule; (2) the Ontario Minister of Consumer and Commercial Relations' direction to the LCBO to sign the 2000 Agreement; (3) the 2015 Liquor Control Act amendments approving of the 2000 Agreement; and (4) the 2015 Agreement between BRI and the government of Ontario reaffirming the six-pack rule.[55] In its view, "there is no way to find that [Anheuser-Busch and Molson Coors] violated the Sherman Act without also finding that the Ontario government violated the Act by entering into the 2000 and 2015 agreements"[56]; ruling for Mountain Crest would "declare the Ontario government's policy choices invalid *and* require the government to dismantle its policy."[57] Moreover, allegations of a "continued … conspirac[y]" were of no significance be-

---

[54] R.60 at 13.

[55] *Id*. at 13–14. The district court noted that the Ontario Superior Court's decision in *Hughes*, 2018 CarswellOnt 3969, confirmed that these actions are public acts of the Ontario government and that the conduct did not violate Ontario law. R.60 at 16.

[56] *Id*. at 14.

[57] *Id*. at 18. The district court found there was "no way that it could remedy any alleged restraints on trade without enjoining the Ontario government" because "it is the practices at *LCBO* stores, not BRI stores, that Mountain Crest is challenging" and "[t]hus, no injunction against defendants could provide Mountain Crest any immediate relief." *Id*. at 15.

cause, "[r]egardless of any conduct by [Anheuser-Busch and Molson Coors], the source of the harm is still the agreement with the government" and the government's endorsement of the agreement in 2015.[58]

The district court declined to determine whether there is a commercial activity exception to the act of state doctrine because, even if there were such an exception, it would not apply. The district court noted that the LCBO is a regulatory agency that did not carry on its business as a profit-maximizing commercial enterprise, and that the 2015 amendment to the Liquor Control Act states the 2015 Agreement relates to the "regulation and control of the sale of beer in Ontario."[59] The court also dismissed Mountain Crest's argument that the act of state doctrine should not apply because it was possible for Anheuser-Busch and Molson Coors to comply with both Canadian and U.S. law before entering the 2000 Agreement and 2015 Agreement. It found that this argument was based on "international comity, not the act of state doctrine, which on its face does not require a private defendant to show that it was compelled to act in a certain way."[60]

---

[58] *Id*. at 22.

[59] *Id*. at 20.

[60] *Id*. at 24 (citing *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 794–97 (1993) (determining that international comity did not require a court to decline to adjudicate a Sherman Act claim involving foreign conduct where foreign law permitted the anticompetitive conduct but did not require it)).

The district court did not consider Anheuser-Busch's and Molson Coors' other arguments. Because the federal claims were dismissed under the act of state doctrine, the district court also dismissed Mountain Crest's state-law claim without prejudice. Mountain Crest timely appealed.

## II.

## DISCUSSION

We now turn to the merits of the dispute before us.[61] In addition to the briefs and arguments of the parties, the Department of Justice ("DOJ") has submitted, at our invitation,[62] an amicus brief advising that the district court properly applied the act of state doctrine and correctly dismissed Mountain Crest's claims that the 2000 Agreement and 2015 Agreement containing the six-pack rule were *per se* violations of the Sherman Antitrust Act, 15 U.S.C. § 1. The DOJ suggests, however, that Mountain Crest made allegations of anticompetitive behavior that must be considered independent of the six-pack rule. In the DOJ's view, these allegations are not subject to the act of state doctrine and should not have been dismissed at this stage of the litigation. In re-

---

[61] We review de novo a district court's decision to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334 (7th Cir. 2012).

[62] We invited the United States to submit an amicus brief addressing the applicability of the act of state doctrine. The Department of Justice accepted our invitation and submitted a brief on behalf of the United States. We thank the Department for having accepted our invitation. The parties were given an opportunity to respond to the Department's submission and have submitted briefs stating their positions.

sponse, Mountain Crest claims that the DOJ misinterprets the act of state doctrine and that the doctrine is not applicable. It agrees, however, that, in any event, it set forth a conspiracy that is not wholly dependent on the acts of the Ontario government. It submits that these other acts, independent of the actions of the Ontario government, are sufficient to support its claim that Anheuser-Busch and Molson Coors violated Sections 1 and 2 of the Sherman Antitrust Act. Anheuser-Busch and Molson Coors counter that, although the DOJ correctly concludes that the act of state doctrine precludes consideration of Mountain Crest's claims related to the 2000 Agreement and 2015 Agreement, the DOJ suggests, incorrectly, that we must vacate the remaining aspects of the district court's judgment and remand to consider an independent conspiracy. We now evaluate these positions. We first discuss the contours of the act of state doctrine and then apply the doctrine to this case.

### A.

Unlike the political question doctrine or claims of sovereign immunity, the act of state doctrine is not a jurisdictional bar nor a theory of abstention; rather, it is a "substantive" doctrine considered "on the merits" of the case. *Republic of Austria v. Altmann*, 541 U.S. 677, 700 (2004).[63] We have not

---

[63] In *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), the Supreme Court, having resolved the question presented to it regarding jurisdiction under the Foreign Sovereign Immunities Act, said that the act of state doctrine "provides foreign states with a substantive *defense* on the merits." *Id.* at 700 (emphasis added). The act of state doctrine, however, can be raised by the defendant as a defense or by the plaintiff as part of its case. *See* Restatement (Fourth) of Foreign Relations Law § 441 n.3

(continued … )

had occasion to address the doctrine in much detail but have described it as "a judicial rule that 'generally forbids an American court to question the act of a foreign sovereign that is lawful under that sovereign's laws.'" *Nocula v. UGS Corp.*, 520 F.3d 719, 727 (7th Cir. 2008) (quoting *F. & H.R. Farman-Farmaian Consulting Eng'rs Firm v. Harza Eng'g Co.*, 882 F.2d 281, 283 (7th Cir. 1989)). There is a "presumption of validity accorded to the official public acts of a foreign country." *Id.* at 728.

The act of state doctrine first appeared in *Underhill v. Hernandez*, 168 U.S. 250 (1897), where the Supreme Court refused to determine whether a Venezuelan military commander, whose revolutionary government later was recognized by the United States, had detained illegally a United States citizen. *Id.* at 254. The Court said that:

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

---

( … continued)
(Am. Law Inst. 2018) (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)).

*Id.* at 252. Although some have regarded *Underhill* to be a sovereign immunity case,[64] the Supreme Court has characterized the case as "[t]he classic American statement of the act of state doctrine," *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 416 (1964), because "holding the defendant's detention of the plaintiff to be tortious would have required denying legal effect" to the acts of the foreign official, *W.S. Kirkpatrick & Co., Inc., v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990). In early act of state cases following *Underhill*, the Court employed the doctrine to refrain from adjudicating property seizures by foreign governments.[65] These early decisions viewed the act of state doctrine "as an expression of international law, resting upon 'the highest considerations of international comity and expediency.'" *W.S. Kirkpatrick*, 493 U.S. at 404 (quoting *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303–04 (1918)).

In *Sabbatino*, the Supreme Court recast the traditional doctrinal foundation of the act of state doctrine, deciding that it was not compelled by either "the inherent nature of sovereign authority" or by international law. 376 U.S. at 421–22. Rather, the Court determined that there were "'constitutional' underpinnings" to the doctrine derived from our sys-

---

[64] *See Indus. Inv. Dev. Co. v. Mitsui & Co., Ltd.*, 594 F.2d 48, 51 n.6 (5th Cir. 1979); Restatement (Fourth) of Foreign Relations Law § 441 n.2 (Am. Law Inst. 2018); John Harrison, *The American Act of State Doctrine*, 47 Geo. J. Int'l L. 507, 526–33 (2016).

[65] *See, e.g., Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303–04 (1918) (declining to examine property seizures because doing so would determine that the seizure within Mexico and by Mexico was legally ineffective); *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918) (same).

tem of separation of powers.[66] *Id.* at 423. Noting "the competency of dissimilar institutions to make and implement particular kinds of decisions in the area of international relations," the Court explained that the act of state doctrine "expresses the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder rather than further this country's pursuit of goals both for itself and for the community of nations as a whole in the international sphere." *Id.* at 424. Put another way, "juridical review of acts of state of a foreign power could embarrass the conduct of foreign relations by the political branches of the government," and "frustrate the conduct of the Nation's foreign policy." *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 765, 769 (1972).

Because the act of state doctrine's "continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs," *Sabbatino* identified various factors for courts to consider before applying the doctrine. 376 U.S. at 427–28. These include "the degree of codification or consensus concerning a particular area of international law"; "the implications of an issue … for our foreign relations"; and whether "the government which perpetrated the challenged act of state" is still in

---

[66] These constitutional underpinnings are structural considerations suggesting the usefulness of the act of state doctrine in certain situations. The Court was clear that "[t]he text of the Constitution does not require the act of state doctrine; it does not irrevocably remove from the judiciary the capacity to review the validity of foreign acts of the states." *Sabbatino*, 376 U.S. at 423.

existence.[67] *Id.* at 428. In *Sabbatino*, the Supreme Court decided that it would "not examine the validity of a taking of property within its own territory by a foreign sovereign government"—there, an expropriation decree by the Cuban government—"in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges the taking violates customary international law."[68] *Id.*

---

[67] In full, the Court stated:

> It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant consideration may also be shifted if the government which perpetrated the challenged act of the state is no longer in existence … for the political interest of this country may, as a result, be measurably altered.

*Sabbatino*, 376 U.S. at 428.

[68] The result of *Sabbatino*—a bar against claims based on the invalidity of Cuban expropriations—has been nullified by Congress. *See* 22 U.S.C. § 2370(e)(2) (the "Second Hickenlooper Amendment"). As evidenced by the Supreme Court's discussion of *Sabbatino* in *W.S. Kirkpatrick & Co., Inc., v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404–06, 409–10, the Hickenlooper Amendment's specific application to cases involving Cuban

(continued … )

The Court's most recent decision concerning the substantive application of the act of state doctrine provides particularly valuable guidance for us in resolving the present case. In *W.S. Kirkpatrick*, 493 U.S. 400, the Court was confronted with a situation where the plaintiffs, unsuccessful bidders for a Nigerian government construction contract, brought an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") alleging that the defendants had obtained the bid by bribing Nigerian officials. Nigerian law prohibited the payment and acceptance of bribes in connection with a government contract. *Id.* at 402. The district court held that the action was barred by the act of state doctrine because proving that the bribes were paid, as required by RICO, would necessarily involve an inquiry into the Nigerian government's motivations, unlawful in that country, that might embarrass the Nigerian government or interfere with the execution of American foreign policy. *Id.* at 403. Relying on the submission of the State Department that the judicial inquiry would not embarrass the Executive Branch in the conduct of our country's foreign relations, the Third Circuit reversed. *Id.* at 403–04.

The Supreme Court affirmed, though on different grounds.[69] It held that the act of state doctrine was inappli-

---

( … continued)
expropriations does not diminish *Sabbatino*'s import to the act of state doctrine generally.

[69] *W.S. Kirkpatrick*, 493 U.S. at 404–05, declined to determine whether there should be an exception to the act of state doctrine where the acts of state in question consist of commercial transactions, *see Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695–706 (1976) (plurality

(continued … )

cable to the case because neither the "relief sought" nor "the defense interposed" required a court to declare invalid the Nigerian government's official act approving the contract. *Id.* at 405. The Court readily admitted that, in the course of adjudicating the RICO claim, a United States court might well make factual findings that would establish the illegality of the contract under Nigerian law. *Id.* at 406. But this was, in effect, no more than a collateral consequence of the court's task in adjudicating the RICO action because the Nigerian contract's "legality wa[s] simply not a question to be decided" in the suit. *Id.* That such judicial fact-finding might embarrass *the Nigerian government* was of no consequence. *Id.* at 409. The Court was clear that the act of state doctrine is simply—and only—a rule of decision that requires an American court, in the process of deciding the case, to accept as valid the acts of another sovereign taken within that sovereign's own jurisdiction. *Id.* Thus, the act of state doctrine only bars suit where "a court *must decide*—that is, when the outcome of the case turns upon—the effect of official action by a foreign sovereign."[70] *Id.* at 406.

---

( … continued)

opinion), or where the Executive Branch asserts that applying the act of state doctrine in a particular instance would not impair its foreign policy interest, *see First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 768–70 (1972) (plurality opinion).

[70] The Supreme Court also acknowledged that there may be occasions where the policy considerations animating the act of state doctrine—international comity, respect for foreign nations, and avoiding interference with the Executive Branch in the conduct of its foreign relations—would justify a court's declining to apply the doctrine despite its "technical availability." *W.S. Kirkpatrick*, 493 U.S. at 409. The Court in *W.S.*

(continued … )

From these holdings of the Supreme Court, we can plot the course that we must take in this case. First, we must determine whether the six-pack rule is attributable to the government of Ontario for the purposes of the act of state doctrine. Second, we must determine whether a decision in Mountain Crest's favor would invalidate those acts.

**B.**

The burden of establishing the applicability of the act of state doctrine rests on the party invoking the doctrine. *See Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 694 (1976). In applying the analytical framework established by the Supreme Court's cases, we first examine whether the 2000 Agreement and 2015 Agreement constitute official acts for the purposes of the act of state doctrine.

Mountain Crest conceded, in its reply brief and at oral argument, that both agreements were official acts of the Province of Ontario for the purposes of the act of state doc-

---

( … continued)

*Kirkpatrick* had no occasion to elaborate further on such situations nor do we today. We note, however, that the change of majority party of the Ontario Legislative Assembly is hardly equivalent to the change in government alluded to in *Sabbatino*. *See, e.g., Bigio v. Coca-Cola Co.*, 239 F.3d 440, 453 (2d Cir. 2000) (declining to apply the act of state doctrine where the act in question occurred thirty-four years prior to the suit and under the government of a dictator who had been dead for thirty years); *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1360–61 (9th Cir. 1988) (en banc) (declining to apply the act of state doctrine where the government had been overthrown).

trine.[71] This concession is well-founded. The 2015 Amendment to the Liquor Control Act ratifying the 2000 Agreement is an official legislative enactment of the Ontario government. Moreover, the LCBO, as the wholly owned Crown agency responsible for the retail sale of alcohol in the province, "is required to abide by the policy decisions and directives of the Government," and "[t]he government exercised considerable control over the LCBO," in which "[c]omplex, high-level decisions were made from time-to-time by senior Government officials."[72] *Hughes*, 2018 CarswellOnt 3969, para. 82, 84. The LCBO's actions entering the two agreements regulating the sale of alcohol within Ontario are official acts

---

[71] Appellant's Reply Br. 4 ("Mountain Crest is not challenging their official status. Just as *Kirkpatrick* did not need to reach arguments about the official status of the Nigerian government contract, the official status of four acts in the present case is irrelevant because their legal effectiveness is not being challenged."); Oral Argument at 15:33–16:00 ("We're not resting on the commercial exception. We don't, we don't need it. … We can accept them all as valid. None of the four acts are being declared … null and void. We are not seeking any kind of declaratory relief … that would seek to deny them legal effect. So … we are happy to accept that they are all official acts.").

[72] We note that the Canadian courts adjudicating antitrust claims arising from the 2000 Agreement under Canadian law dismissed those claims pursuant to Canada's "Regulated Conduct Defence." *Hughes*, 2018 CarswellOnt 3969, para. 237–47; *see also id.* at para. 240 ("The 2000 Beer Framework Agreement was in the wheelhouse … of the powers and rights conferred on the LCBO and Brewers Retail under the *Liquor Control Act*."). At its most basic level, the Regulated Conduct Defence provides that "conduct authorized by valid provincial or federal legislation … deemed to be in the public interest … cannot constitute an 'undue' limit on competition." *Id.* at para. 221.

of the Ontario government.[73] Finally, with respect to the 2015 Agreement, *the government of Ontario* is an actual party to that agreement. Therefore, the acts in question are official acts of the Ontario government.

The district court assumed, as do the parties, that the "act of state doctrine applies the same way to a provincial government as to a national government."[74] This assumption is certainly correct in the circumstances presented here because a national statute authorizes the acts of the LCBO.[75] We also note that most other courts that have confronted this issue have determined that the act of state doctrine applies to acts of sub-national governments.[76] Moreover, in construing the

---

[73] *Cf. Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064, 1069 (9th Cir. 2018) (determining that the acts of a corporation that is majority-owned and controlled by the Mexican government were official, sovereign acts).

[74] R.60 at 13 n.5.

[75] R.S.C. 1985, c. I-3, § 3 (banning, with limited exceptions, any interprovincial or international trade in alcoholic beverages other than that carried about by the provincial liquor boards); *see also, Canadian Breweries*, [1960] O.R. 601, para. 39 (noting that "each Province has jurisdiction to regulate and control the sale of liquor within its boundaries and to fix the prices at which, and the conditions under which liquor may be sold").

[76] *See In re Fresh & Process Potatoes Antitrust Litigation*, 834 F. Supp. 2d 1141, 1180 (D. Idaho 2011) (cooperative of Canadian provincial governments acted in sovereign capacity for purposes of act of state doctrine); *Occidental Petroleum Corp v. Buttes Gas & Oil Co.*, 331 F. Supp. 92, 113 (C.D. Cal. 1971) (sheikdoms of United Arab Emirates acted in sovereign capacity); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 293 F. Supp. 892,

(continued … )

act of state doctrine and defining its terms, courts have sometimes looked to the Foreign Sovereign Immunity Act[77]; that statute defines "foreign state" to include "a political subdivision of a foreign state." 28 U.S.C. § 1603(a). Finally, turning to the policy concerns animating the act of state doctrine, judicial questioning of the acts of a sub-national government could interfere with the foreign relations efforts of our political branches just as much as questioning the acts of a national government could. Therefore, the first prong of the act of state doctrine analysis is met: the agreements establishing the six-pack rule are acts of state for the purposes of the doctrine.

Our next task is to examine whether, in adjudicating this case, the court "*must decide* … the effect of official action by a foreign sovereign." *W.S. Kirkpatrick*, 493 U.S. at 406. In short, we ask whether the Ontario legislation giving the six-pack rule the force and effect of law determines the "outcome of the case." *Id*. Put another way, does the "relief sought or the defense interposed" by Mountain Crest "require[] a court in the United States to declare invalid the official act[s]" of the

( … continued)
910 (S.D.N.Y. 1968) (act of state doctrine applies to member states of West Germany), *aff'd* 433 F.2d 686 (2d Cir. 1970). *But see Am. Indus. Contracting, Inc. v. Johns-Manville Corp.*, 326 F. Supp. 879, 881 (W.D. Pa. 1971) (determining that "[t]he province of Quebec is not a State within the meanings of the doctrines of international law" because "[t]hese doctrines only apply to nations in the international sense such as the United States and Canada").

[77] *See, e.g.*, *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

Ontario government, and thus render them "ineffective as 'a rule of decision for the courts of this country'"? *Id.* at 405 (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)). To answer that question, we must return to the Second Amended Complaint and determine precisely the nature of Mountain Crest's allegations.

As the case comes to us, it is clear, despite the operative complaint's prolixity and, at times, unartful language, that Mountain Crest is seeking, through injunctive and declaratory relief, an adjudication that the six-pack rule established by the Ontario government is inoperative.[78] First, it claims that the six-pack rule, contained in agreements entered into by the Ontario government and approved of in legislation, violates Section 1 of the Sherman Antitrust Act because it constitutes a price-fixing and market allocation arrangement. These agreements are *per se* unlawful; the mere existence of such an arrangement violates the statute. *Leegin Creative Leather Prods., Inc., v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Moreover, the existence of a *per se* unlawful agreement "justifies [its] facial invalidation."[79] *Arizona v. Maricopa Cty. Med.*

---

[78] Mountain Crest's claims premised directly on the six-pack rule are further complicated by the recent action of the Ontario government repudiating the 2015 Agreement. *See Bill 115, Bringing Choice and Fairness to the People Act (Beverage Alcohol Retail Sales)*, 1st Sess., 42nd Leg., Ontario, 2019 (royal assent received June 6, 2019). This matter has not been argued to us, and we believe that the most expeditious manner of evaluating this development is to permit the district court to address it on remand.

[79] The operation of the Sherman Antitrust Act here differs from the operation of RICO in *W.S. Kirkpatrick*. Determining an agreement is unlaw-

(continued … )

*Soc'y*, 457 U.S. 332, 351 (1982). Therefore, to the extent that Mountain Crest attacks the six-pack rule on this ground, the act of state doctrine is, as our colleague in the district court recognized, applicable.

Mountain Crest also asks for declaratory and injunctive relief precluding the six-pack rule established by the Ontario government because it violated Section 2 of the Sherman Antitrust Act. This section makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To the extent that Mountain Crest seeks relief under this section predicated solely on the six-pack rule, the act of state doctrine clearly precludes the action. Adjudication of liability on this basis would have the effect of invalidating the Ontario government's choice to extend monopoly benefits to Anheuser-Busch and Molson Coors.

Nevertheless, Mountain Crest's operative complaint, fairly read, is not limited to the theories of recovery that we have just addressed. The Second Amended Complaint also sets out allegations that Anheuser-Busch and Molson Coors, acting through their officers and employees, violated the same provisions of the Sherman Act by conspiring to bring about the Ontario government's approval of the six-pack rule. These allegations do not implicate the act of state doc-

---

( … continued)

ful under 15 U.S.C. § 1 necessarily invalidates that agreement; determining an agreement was procured by bribery under RICO merely penalizes the individual undertaking the racketeering activity. *See* 18 U.S.C. §§ 1963, 1964.

trine. *W.S. Kirkpatrick*, 493 U.S. at 407, indicated that, where the plaintiff is "not trying to undo or disregard governmental action," it may "obtain damages from [the] private parties that procured it" illegally. In reaching its conclusion, the Court noted its earlier decision in *United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927). *W.S. Kirkpatrick*, 493 U.S. at 407. In *Sisal Sales*, 274 U.S. at 276, the Court did not bar an antitrust complaint where defendants took "deliberate acts" to "br[ing] about forbidden results" simply because the anticompetitive conspiracy was aided by discriminatory legislation obtained from the Mexican government by the defendants. Mountain Crest sets forth facts that, if accepted by a trier of fact, might demonstrate that the defendants took concerted action to bring about the Ontario legislation. Holding Anheuser-Busch and Molson Coors liable for their antecedent and allegedly deliberate acts to bring about the six-pack rule and requiring them to pay damages to Mountain Crest would not, on its face, invalidate Ontario's chosen regulatory scheme.

The district court did not consider the Second Amended Complaint from this perspective, and, upon examination of the record, we cannot say that Mountain Crest has waived any reliance on these allegations. We are aware that such allegations raise significant questions of causality. We also are aware that there may be other possible defenses, including but not limited to the applicability of the *Noerr-Pennington*[80]

---

[80] *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

doctrine to the lobbying of foreign governments,[81] that must
be explored. These matters never have been addressed by
the district court and have been addressed in only a tangen-
tial way during this appeal. If the parties wish, they may
raise these matters in the district court.

The Second Amended Complaint also addresses another
area that, so far, has not come under the district court's scru-
tiny. It plainly sets forth other activities of Anheuser-Busch
and Molson Coors, perhaps independent of the six-pack
rule, that, in Mountain Crest's view, implicate the strictures
of the Sherman Antitrust Act. Mountain Crest has alleged a
pattern of other marketing and distribution practices that it
claims manipulated The Beer Store's internal sales approach
to disfavor American products, including Mountain Crest's
product. These practices, according to the operative com-
plaint, prevented Mountain Crest from achieving the econ-
omies of scale necessary to make its participation in the On-

---

[81] *Compare Coastal Sales Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1364–67 (5th
Cir. 1983) (extending *Noerr-Pennington* to petitioning of foreign govern-
ments because "*Noerr* was based on a construction of the Sherman Act"
and there are "no reasons why acts that are legal and protected if done in
the United States should in a United States court become evidence of
illegal conduct because performed abroad"), *and Carpet Grp. Int'l v. Ori-
ental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 266 (D.N.J. 2003)
(agreeing with the Fifth Circuit), *with Occidental Petroleum Corp. v. Buttes
Gas & Oil Co.*, 331 F. Supp. 92, 107–08 (C.D. Cal. 1971) (holding that
*Noerr-Pennington* does not extend to petitioning of foreign governments
because the doctrine was based on "avoid[ing] a construction of the anti-
trust laws that might trespass upon the First Amendment right of peti-
tion" and that concept "carries limited if indeed any applicability to the
petitioning of foreign governments"), *aff'd*, 461 F.2d 1261 (9th Cir. 1972).

tario market profitable. We cannot discern any basis for say-
ing that Mountain Crest has waived these claims. Accord-
ingly, on remand, the district court should address these
claims in due course.

### Conclusion

For the reasons set forth in this opinion, we affirm in part
and vacate in part the judgment of the district court and re-
mand the case for proceedings consistent with this opinion.
Mountain Crest may recover the costs of this appeal.

AFFIRMED in part, VACATED and REMANDED in part